PERPICH, GOVERNOR OF MINNESOTA, ET AL. *v.*
DEPARTMENT OF DEFENSE ET AL.

No. 89–542.   Argued March 27, 1990—Decided June 11, 1990

STEVENS, J., delivered the opinion for a unanimous Court.

*John R. Tunheim,* Chief Deputy Attorney General of Minnesota, argued the cause for petitioners. With him on the briefs were *Hubert H. Humphrey III,* Attorney General, and *Peter M. Ackerberg,* Special Assistant Attorney General.

*Solicitor General Starr* argued the cause for respondents. With him on the brief were *Assistant Attorney General Gerson, Deputy Solicitor General Merrill, James A. Feldman,* and *Anthony J. Steinmeyer.*\*

*\*James M. Shannon,* Attorney General of Massachusetts, and *Douglas H. Wilkins* and *Eric Mogilnicki,* Assistant Attorneys General, *Thomas J. Miller,* Attorney General of Iowa, *James E. Tierney,* Attorney General of

JUSTICE STEVENS delivered the opinion of the Court.

The question presented is whether the Congress may authorize the President to order members of the National Guard to active duty for purposes of training outside the United States during peacetime without either the consent of a State Governor or the declaration of a national emergency.

A gubernatorial consent requirement that had been enacted in 1952[1] was partially repealed in 1986 by the "Montgomery Amendment," which provides:

Maine, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, and *Jeffrey Amestoy*, Attorney General of Vermont, filed a brief for the State of Iowa et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the National Guard Association of the United States et al. by *Stephen M. Shapiro* and *Michael K. Kellogg*, and by the Attorneys General for their respective States as follows: *Don Siegelman* of Alabama, *Douglas B. Baily* of Alaska, *Charles M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Jim Jones* of Idaho, *Linley E. Pearson* of Indiana, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.*, of Louisiana, *J. Joseph Curran, Jr.*, of Maryland, *Mike Moore* of Mississippi, *William L. Webster* of Missouri, *Brian McKay* of Nevada, *Hal Stratton* of New Mexico, *Lacy H. Thornburg* of North Carolina, *Robert H. Henry* of Oklahoma, *T. Travis Medlock* of South Carolina, *Roger A. Tellinghuisen* of South Dakota, *Charles W. Burson* of Tennessee, *R. Paul Van Dam* of Utah, *Mary Sue Terry* of Virginia, *Donald J. Hanaway* of Wisconsin, and *Joseph B. Meyer* of Wyoming; for the Firearms Civil Rights Legal Defense Fund by *Stephen P. Halbrook* and *Robert Dowlut;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo, Paul D. Kamenar*, and *John C. Scully*.

[1] The Armed Forces Reserve Act of 1952, provided in part:

"Sec. 101. When used in this Act—

.     .     .     .     .

"(c) 'Active duty for training' means full-time duty in the active military service of the United States for training purposes." 66 Stat. 481.

"[Section 233] (c) At any time, any unit and the members thereof, or any member not assigned to a unit organized for the purpose of serving as such, in an active status in any reserve component may, by competent authority, be ordered to and required to perform active duty or active duty for training, without his consent, for not to exceed fifteen days annually: *Provided*, That units and members of the National Guard of the United States or the

"The consent of a Governor described in subsections (b) and (d) may not be withheld (in whole or in part) with regard to active duty outside the United States, its territories, and its possessions, because of any objection to the location, purpose, type, or schedule of such active duty."[2]

In this litigation the Governor of Minnesota and the State of Minnesota (hereinafter collectively referred to as the Governor), challenge the constitutionality of that amendment. The Governor contends that it violates the Militia Clauses of the Constitution.[3]

---

Air National Guard of the United States shall not be ordered to or required to serve on active duty in the service of the United States pursuant to this subsection without the consent of the Governor of the State or Territory concerned, or the Commanding General of the District of Columbia National Guard.

"(d) A member of a reserve component may, by competent authority, be ordered to active duty or active duty for training at any time with his consent: *Provided*, That no member of the National Guard of the United States or Air National Guard of the United States shall be so ordered without the consent of the Governor or other appropriate authority of the State, Territory, or District of Columbia concerned." *Id.*, at 490.

These provisions, as amended, are now codified at 10 U. S. C. §§ 672(b) and 672(d).

[2] The Montgomery Amendment was enacted as § 522 of the National Defense Authorization Act for Fiscal Year 1987, Pub. L. 99–661, § 522, 100 Stat. 3871.

[3] Two clauses of Article I—clauses 15 and 16 of § 8—are commonly described as "the Militia Clause" or "the Militia Clauses." They provide:

"The Congress shall have Power . . .

.           .           .           .           .

"To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

"To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress."

In his complaint the Governor alleged that pursuant to a state statute the Minnesota National Guard is the organized militia of the State of Minnesota and that pursuant to a federal statute members of that militia "are also members of either the Minnesota unit of the Air National Guard of the United States or the Minnesota unit of the Army National Guard of the United States (hereinafter collectively referred to as the 'National Guard of the United States')." App. 5. The complaint further alleged that the Montgomery Amendment had prevented the Governor from withholding his consent to a training mission in Central America for certain members of the Minnesota National Guard in January 1987, and prayed for an injunction against the implementation of any similar orders without his consent.

The District Judge rejected the Governor's challenge. He explained that the National Guard consists of "two overlapping, but legally distinct, organizations. Congress, under its constitutional authority to 'raise and support armies' has created the National Guard of the United States, a federal organization comprised of state national guard units and their members." 666 F. Supp. 1319, 1320 (Minn. 1987).[4] The fact that these units also maintain an identity as

---

[4] In addition to the powers granted by the Militia Clauses, n. 3, *supra,* Congress possesses the following powers conferred by Art. I, § 8:

"The Congress shall have Power . . . to pay the Debts and provide for the common Defence and general Welfare of the United States; . . .

. . . . .

"To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water;

"To raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years;

"To provide and maintain a Navy;

"To make Rules for the Government and Regulation of the land and naval Forces;

. . . . .

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Con-

State National Guards, part of the militia described in Art. I, §8, of the Constitution, does not limit Congress' plenary authority to train the Guard "as it sees fit when the Guard is called to active federal service." *Id.*, at 1324. He therefore concluded that "the gubernatorial veto found in §§ 672(b) and 672(d) is not constitutionally required. Having created the gubernatorial veto as an accommodation to the states, rather than pursuant to a constitutional mandate, the Congress may withdraw the veto without violating the Constitution." *Ibid.*

A divided panel of the Court of Appeals for the Eighth Circuit reached a contrary conclusion. It read the Militia Clauses as preserving state authority over the training of the National Guard and its membership unless and until Congress "determined that there was some sort of exigency or extraordinary need to exert federal power." App. to Pet. for Cert. A92. Only in that event could the army power dissipate the authority reserved to the States under the Militia Clauses.

In response to a petition for rehearing en banc, the Court of Appeals vacated the panel decision and affirmed the judgment of the District Court. Over the dissent of two judges, the en banc court agreed with the District Court's conclusion that "Congress' army power is plenary and exclusive" and that the State's authority to train the militia did not conflict with congressional power to raise armies for the common defense and to control the training of federal reserve forces. 880 F. 2d 11, 17–18 (1989).

Because of the manifest importance of the issue, we granted the Governor's petition for certiorari. 493 U. S. 1017 (1990). In the end, we conclude that the plain language

---

stitution in the Government of the United States, or in any Department or Officer thereof."

Moreover, Art. IV, § 4, provides:

"The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."

of Article I of the Constitution, read as whole, requires affirmance of the Court of Appeals' judgment. We believe, however, that a brief description of the evolution of the present statutory scheme will help to explain that holding.

I

Two conflicting themes, developed at the Constitutional Convention and repeated in debates over military policy during the next century, led to a compromise in the text of the Constitution and in later statutory enactments. On the one hand, there was a widespread fear that a national standing Army posed an intolerable threat to individual liberty and to the sovereignty of the separate States,[5] while, on the other hand, there was a recognition of the danger of relying on inadequately trained soldiers as the primary means of providing for the common defense.[6] Thus, Congress was authorized both to raise and support a national Army and also to organize "the Militia."

[5] At the Virginia ratification convention, Edmund Randolph stated that "there was not a member in the federal Convention, who did not feel indignation" at the idea of a standing Army. 3 J. Elliot, Debates on the Federal Constitution 401 (1863).

[6] As Alexander Hamilton argued in the Federalist Papers:

"Here I expect we shall be told that the militia of the country is its natural bulwark, and would be at all times equal to the national defence. This doctrine, in substance, had like to have lost us our independence. It cost millions to the United States that might have been saved. The facts which, from our own experience, forbid a reliance of this kind, are too recent to permit us to be the dupes of such a suggestion. The steady operations of war against a regular and disciplined army can only be successfully conducted by a force of the same kind. Considerations of economy, not less than of stability and vigor, confirm this position. The American militia, in the course of the late war, have, by their valor on numerous occasions, erected eternal monuments to their fame; but the bravest of them feel and know that the liberty of their country could not have been established by their efforts alone, however great and valuable they were. War, like most other things, is a science to be acquired and perfected by diligence, by perseverance, by time, and by practice." The Federalist No. 25, pp. 156–157 (E. Earle ed. 1938).

In the early years of the Republic, Congress did neither. In 1792, it did pass a statute that purported to establish "an Uniform Militia throughout the United States," but its detailed command that every able-bodied male citizen between the ages of 18 and 45 be enrolled therein and equip himself with appropriate weaponry[7] was virtually ignored for more than a century, during which time the militia proved to be a decidedly unreliable fighting force.[8] The statute was finally repealed in 1901.[9] It was in that year that President Theodore Roosevelt declared: "Our militia law is obsolete and worthless."[10] The process of transforming "the National

---

[7] "That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack." 1 Stat. 271.

[8] Wiener, The Militia Clause of the Constitution, 54 Harv. L. Rev. 181, 187–194 (1940).

[9] See 31 Stat. 748, 758.

[10] "Action should be taken in reference to the militia and to the raising of volunteer forces. Our militia law is obsolete and worthless. The organization and armament of the National Guard of the several States, which are treated as militia in the appropriations by the Congress, should be made identical with those provided for the regular forces. The obligations and duties of the Guard in time of war should be carefully defined, and a system established by law under which the method of procedure of raising volunteer forces should be prescribed in advance. It is utterly impossible in the excitement and haste of impending war to do this satisfactorily if the arrangements have not been made long beforehand. Provision should be made for utilizing in the first volunteer organizations called out the training of those citizens who have already had experience under arms, and especially for the selection in advance of the officers of any force which may be raised; for careful selection of the kind necessary is impossible after the outbreak of war." First Annual Message to Congress, Dec. 3, 1901, 14 Messages and Papers of the Presidents 6672.

Guard of the several States" into an effective fighting force then began.

The Dick Act divided the class of able-bodied male citizens between 18 and 45 years of age into an "organized militia" to be known as the National Guard of the several States, and the remainder of which was then described as the "reserve militia," and which later statutes have termed the "unorganized militia." The statute created a table of organization for the National Guard conforming to that of the Regular Army, and provided that federal funds and Regular Army instructors should be used to train its members.[11] It is undisputed that Congress was acting pursuant to the Militia Clauses of the Constitution in passing the Dick Act. Moreover, the legislative history of that Act indicates that Congress contemplated that the services of the organized militia would "be rendered only upon the soil of the United States or of its Territories." H. R. Rep. No. 1094, 57th Cong., 1st Sess., 22 (1902). In 1908, however, the statute was amended to pro-

---

[11] The Act of January 21, 1903, 32 Stat. 775, provided in part:

"That the militia shall consist of every able-bodied male citizen of the respective States, Territories, and the District of Columbia, and every able-bodied male of foreign birth who has declared his intention to become a citizen, who is more than eighteen and less than forty-five years of age, and shall be divided into two classes — the organized militia, to be known as the National Guard of the State, Territory, or District of Columbia, or by such other designations as may be given them by the laws of the respective States or Territories, and the remainder to be known as the Reserve Militia."

Section 3 of the 1903 Act provided in part:

"That the regularly enlisted, organized, and uniformed active militia in the several States and Territories and the District of Columbia who have heretofore participated or shall hereafter participate in the apportionment of the annual appropriation provided by section sixteen hundred and sixty-one of the Revised Statutes of the United States, as amended, whether known and designated as National Guard, militia, or otherwise, shall constitute the organized militia." *Ibid.*

Section 4 of the 1903 Act authorized the President to call forth the militia for a period not exceeding nine months. *Id.*, at 776.

vide expressly that the Organized Militia should be available for service "either within or without the territory of the United States." [12]

When the Army made plans to invoke that authority by using National Guard units south of the Mexican border, Attorney General Wickersham expressed the opinion that the Militia Clauses precluded such use outside the Nation's borders. [13] In response to that opinion and to the widening conflict in Europe, in 1916 Congress decided to "federalize" the National Guard. [14] In addition to providing for greater federal control and federal funding of the Guard, the statute required every guardsman to take a dual oath—to support the Nation as well as the States and to obey the President as well as the Governor—and authorized the President to draft members of the Guard into federal service. The statute expressly provided that the Army of the United States should include not only "the Regular Army," but also "the National

---

[12] Section 4, 35 Stat. 400.

[13] "It is certain that it is only upon one or more of these three occasions— when it is necessary to suppress insurrections, repel invasions, or to execute the laws of the United States—that even Congress can call this militia into the service of the United States, or authorize it to be done." 29 Op. Atty. Gen. 322, 323–324 (1912).

"The plain and certain meaning and effect of this constitutional provision is to confer upon Congress the power to call out the militia 'to execute the laws of the Union' within our own borders where, and where only, they exist, have any force, or can be executed by any one. This confers no power to send the militia into a foreign country to execute our laws which have no existence or force there and can not be there executed." Id., at 327.

Under Attorney General Wickersham's analysis, it would apparently be unconstitutional to call forth the militia for training duty outside the United States, even with the consent of the appropriate Governor. Of course, his opinion assumed that the militia units so called forth would retain their separate status in the state militia during their period of federal service.

[14] See Wiener, 54 Harv. L. Rev., at 199–203.

Guard while in the service of the United States,"[15] and that when drafted into federal service by the President, members of the Guard so drafted should "from the date of their draft, stand discharged from the militia, and shall from said date be subject to" the rules and regulations governing the Regular Army. § 111, 39 Stat. 211.

During World War I, the President exercised the power to draft members of the National Guard into the Regular Army. That power, as well as the power to compel civilians to render military service, was upheld in the *Selective Draft Law Cases*, 245 U. S. 366 (1918).[16] Specifically, in those cases, and in *Cox* v. *Wood*, 247 U. S. 3 (1918), the Court held that the plenary power to raise armies was "not qualified or restricted by the provisions of the militia clause."[17]

---

[15] The National Defense Act of June 3, 1916, 39 Stat. 166, provided in part:

"That the Army of the United States shall consist of the Regular Army, the Volunteer Army, the Officers' Reserve Corps, the Enlisted Reserve Corps, the National Guard while in the service of the United States, and such other land forces as are now or may hereafter be authorized by law."

[16] "The possession of authority to enact the statute must be found in the clauses of the Constitution giving Congress power 'to declare war; . . . to raise and support armies, but no appropriation of money to that use shall be for a longer term than two years; . . . to make rules for the government and regulation of the land and naval forces.' Article I, § 8. And of course the powers conferred by these provisions like all other powers given carry with them as provided by the Constitution the authority 'to make all laws which shall be necessary and proper for carrying into execution the foregoing powers.' Article I, § 8." 245 U. S., at 377.

[17] "This result is apparent since on the face of the opinion delivered in those cases the constitutional power of Congress to compel the military service which the assailed law commanded was based on the following propositions: (a) That the power of Congress to compel military service and the duty of the citizen to render it when called for were derived from the authority given to Congress by the Constitution to declare war and to raise armies. (b) That those powers were not qualified or restricted by the provisions of the militia clause, and hence the authority in the exercise of the war power to raise armies and use them when raised was not subject to limitations as to use of the militia, if any, deduced from the militia

The draft of the individual members of the National Guard into the Army during World War I virtually destroyed the Guard as an effective organization. The draft terminated the members' status as militiamen, and the statute did not provide for a restoration of their prewar status as members of the Guard when they were mustered out of the Army. This problem was ultimately remedied by the 1933 amendments to the 1916 Act. Those amendments created the "two overlapping but distinct organizations" described by the District Court—the National Guard of the various States and the National Guard of the United States.

Since 1933 all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States. In the latter capacity they became a part of the Enlisted Reserve Corps of the Army, but unless and until ordered to active duty in the Army, they retained their status as members of a separate State Guard unit. Under the 1933 Act, they could be ordered into active service whenever Congress declared a national emergency and authorized the use of troops in excess of those in the Regular Army. The statute plainly described the effect of such an order:

> "All persons so ordered into the active military service of the United States shall from the date of such order stand relieved from duty in the National Guard of their respective States, Territories, and the District of Columbia so long as they shall remain in the active military service of the United States, and during such time shall be subject

clause. And (c) that from these principles it also follows that the power to call for military duty under the authority to declare war and raise armies and the duty of the citizen to serve when called were coterminous with the constitutional grant from which the authority was derived and knew no limit deduced from a separate, and for the purpose of the war power, wholly incidental, if not irrelevant and subordinate, provision concerning the militia, found in the Constitution. Our duty to affirm is therefore made clear." 247 U. S., at 6.

to such laws and regulations for the government of the Army of the United States as may be applicable to members of the Army whose permanent retention in active military service is not contemplated by law. The organization of said units existing at the date of the order into active Federal service shall be maintained intact insofar as practicable." § 18, 48 Stat. 160–161.

"Upon being relieved from active duty in the military service of the United States all individuals and units shall thereupon revert to their National Guard status." *Id.,* at 161.

Thus, under the "dual enlistment" provisions of the statute that have been in effect since 1933, a member of the Guard who is ordered to active duty in the federal service is thereby relieved of his or her status in the State Guard for the entire period of federal service.

Until 1952 the statutory authority to order National Guard units to active duty was limited to periods of national emergency. In that year, Congress broadly authorized orders to "active duty or active duty for training" without any emergency requirement, but provided that such orders could not be issued without gubernatorial consent. The National Guard units have under this plan become a sizable portion of the Nation's military forces; for example, "the Army National Guard provides 46 percent of the combat units and 28 percent of the support forces of the Total Army."[18] Apparently gubernatorial consents to training missions were routinely obtained until 1985, when the Governor of California refused to consent to a training mission for 450 members of the California National Guard in Honduras, and the Governor of Maine shortly thereafter refused to consent to a similar mission. Those incidents led to the enactment of the Montgomery Amendment and this litigation ensued.

---

[18] App. 12 (testimony of James H. Webb, Assistant Secretary of Defense for Reserve Affairs, before a subcommittee of the Senate Armed Services Committee on July 15, 1986).

## II

The Governor's attack on the Montgomery Amendment relies in part on the traditional understanding that "the Militia" can only be called forth for three limited purposes that do not encompass either foreign service or nonemergency conditions, and in part on the express language in the second Militia Clause reserving to the States "the Authority of training the Militia." The Governor does not, however, challenge the authority of Congress to create a dual enlistment program.[19] Nor does the Governor claim that membership in a State Guard unit — or any type of state militia—creates any sort of constitutional immunity from being drafted into the Federal Armed Forces. Indeed, it would be ironic to claim such immunity when every member of the Minnesota National Guard has voluntarily enlisted, or accepted a commission as an officer, in the National Guard of the United States and thereby become a member of the Reserve Corps of the Army.

The unchallenged validity of the dual enlistment system means that the members of the National Guard of Minnesota who are ordered into federal service with the National Guard of the United States lose their status as members of the state militia during their period of active duty. If that duty is a training mission, the training is performed by the Army in which the trainee is serving, not by the militia from which the member has been temporarily disassociated. "Each member of the Army National Guard of the United States or the Air National Guard of the United States who is ordered to active duty is relieved from duty in the National Guard of his State or Territory, or of Puerto Rico or the District of Columbia, as

---

[19] "The dual enlistment system requires state National Guard members to simultaneously enroll in the National Guard of the United States (NGUS), a reserve component of the national armed forces. 10 U. S. C. §§ 101(11) and (13), 591(a), 3261, 8261; 32 U. S. C. §§ 101(5) and (7). It is an essential aspect of traditional military policy of the United States. 32 U. S. C. § 102. The State of Minnesota fully supports dual enlistment and has not challenged the concept in any respect." Reply Brief for Petitioners 9 (footnote omitted).

the case may be, from the effective date of his order to active duty until he is relieved from that duty." 32 U. S. C. § 325(a).

This change in status is unremarkable in light of the traditional understanding of the militia as a part-time, nonprofessional fighting force. In *Dunne* v. *People*, 94 Ill. 120 (1879), the Illinois Supreme Court expressed its understanding of the term "militia" as follows:

> "Lexicographers and others define militia, and so the common understanding is, to be 'a body of armed citizens trained to military duty, who may be called out in certain cases, but may not be kept on service like standing armies, in time of peace.' That is the case as to the active militia of this State. The men comprising it come from the body of the militia, and when not engaged at stated periods in drilling and other exercises, they return to their usual avocations, as is usual with militia, and are subject to call when the public exigencies demand it." *Id.*, at 138.

Notwithstanding the brief periods of federal service, the members of the State Guard unit continue to satisfy this description of a militia. In a sense, all of them now must keep three hats in their closets — a civilian hat, a state militia hat, and an army hat — only one of which is worn at any particular time. When the state militia hat is being worn, the "drilling and other exercises" referred to by the Illinois Supreme Court are performed pursuant to "the Authority of training the Militia according to the discipline prescribed by Congress," but when that hat is replaced by the federal hat, the second Militia Clause is no longer applicable.

This conclusion is unaffected by the fact that prior to 1952 Guard members were traditionally not ordered into active service in peacetime or for duty abroad. That tradition is at least partially the product of political debate and political

compromise, but even if the tradition were compelled by the text of the Constitution, its constitutional aspect is related only to service by State Guard personnel who retain their state affiliation during their periods of service. There now exists a wholly different situation, in which the state affiliation is suspended in favor of an entirely federal affiliation during the period of active duty.

This view of the constitutional issue was presupposed by our decision in the *Selective Draft Law Cases*, 245 U. S. 366 (1918). Although the Governor is correct in pointing out that those cases were decided in the context of an actual war, the reasoning in our opinion was not so limited. After expressly noting that the 1916 Act had incorporated members of the National Guard into the National Army, the Court held that the Militia Clauses do not constrain the powers of Congress "to provide for the common Defence," to "raise and support Armies," to "make Rules for the Government and Regulation of the land and naval Forces," or to enact such laws as "shall be necessary and proper" for executing those powers. *Id.*, at 375, 377, 381–384. The Court instead held that, far from being a limitation on those powers, the Militia Clauses are—as the constitutional text plainly indicates—additional grants of power to Congress.

The first empowers Congress to call forth the militia "to execute the Laws of the Union, suppress Insurrections and repel Invasions." We may assume that Attorney General Wickersham was entirely correct in reasoning that when a National Guard unit retains its status as a state militia, Congress could not "impress" the entire unit for any other purpose. Congress did, however, authorize the President to call forth the entire membership of the Guard into federal service during World War I, even though the soldiers who fought in France were not engaged in any of the three specified purposes. Membership in the militia did not exempt

them from a valid order to perform federal service, whether that service took the form of combat duty or training for such duty.[20]  The congressional power to call forth the militia may in appropriate cases supplement its broader power to raise armies and provide for the common defense and general welfare, but it does not limit those powers.[21]

The second Militia Clause enhances federal power in three additional ways.  First, it authorizes Congress to provide for "organizing, arming and disciplining the Militia."  It is by congressional choice that the available pool of citizens has been formed into organized units.  Over the years, Congress has exercised this power in various ways, but its current choice of a dual enlistment system is just as permissible as the 1792 choice to have the members of the militia arm themselves.  Second, the Clause authorizes Congress to provide for governing such part of the militia as may be employed in the service of the United States.  Surely this authority encompasses continued training while on active duty.  Finally, although the appointment of officers "and the Authority of training the Militia" is reserved to the States respectively, that limitation is, in turn, limited by the words "according to the discipline prescribed by Congress."  If the discipline required for effective service in the Armed Forces of a global power requires training in distant lands, or distant skies, Congress has the authority to provide it.  The subordinate

---

[20] See *Selective Draft Law Cases*, 245 U. S. 366, 382–389 (1918); *Cox* v. *Wood*, 247 U. S. 3, 6 (1918).

[21] Congress has by distinct statutes provided for activating the National Guard of the United States and for calling forth the militia, including the National Guards of the various States.  See 10 U. S. C. §§ 672–675 (authorizing executive officials to order reserve forces, including the National Guard of the United States and the Air National Guard of the United States, to active duty); 10 U. S. C. §§ 331–333 (authorizing executive officials to call forth the militia of the States); 10 U. S. C. §§ 3500, 8500 (authorizing executive officials to call forth the National Guards of the various States).  When the National Guard units of the States are called forth, the orders "shall be issued through the governors of the States."  § 3500.

authority to perform the actual training prior to active duty in the federal service does not include the right to edit the discipline that Congress may prescribe for Guard members after they are ordered into federal service.

The Governor argues that this interpretation of the Militia Clauses has the practical effect of nullifying an important state power that is expressly reserved in the Constitution. We disagree. It merely recognizes the supremacy of federal power in the area of military affairs.[22] The Federal Government provides virtually all of the funding, the materiel, and the leadership for the State Guard units. The Minnesota unit, which includes about 13,000 members, is affected only slightly when a few dozen, or at most a few hundred, soldiers are ordered into active service for brief periods of time.[23] Neither the State's basic training responsibility, nor its ability to rely on its own Guard in state emergency situations, is significantly affected. Indeed, if the federal training mission were to interfere with the State Guard's capacity to respond to local emergencies, the Montgomery Amendment would permit the Governor to veto the proposed mission.[24] More-

---

[22] This supremacy is evidenced by several constitutional provisions, especially the prohibition in Art. I, § 10, of the Constitution, which states:

"No State shall, without the Consent of Congress, lay any duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."

[23] According to the Governor, at most "only several hundred" of Minnesota's National Guard members "will be in federal training at any one time." Brief for Petitioners 41.

[24] The Montgomery Amendment deprives the Governors of the power to veto participation in a National Guard of the United States training mission on the basis of any objection to "the location, purpose, type, or schedule of such active duty." 10 U. S. C. § 672(f). Governors may withhold their consent on other grounds. The Governor and the United States agree that if the federalization of the Guard would interfere with the State Guard's ability to address a local emergency, that circumstance would be a

over, Congress has provided by statute that in addition to its National Guard, a State may provide and maintain at its own expense a defense force that is exempt from being drafted into the Armed Forces of the United States. See 32 U. S. C. § 109(c). As long as that provision remains in effect, there is no basis for an argument that the federal statutory scheme deprives Minnesota of any constitutional entitlement to a separate militia of its own.[25]

---

valid basis for a gubernatorial veto. Brief for Petitioners 41; Brief for Respondents 9.

The Governor contends that the residual veto power is of little use. He predicates this argument, however, on a claim that the federal training program has so minimal an impact upon the State Guard that the veto is never necessary:

"Minnesota has approximately 13,000 members of the National Guard. At most, only several hundred will be in federal training at any one time. To suggest that a governor will ever be able to withhold consent under the Montgomery Amendment assumes (1) local emergencies can be adequately predicted in advance, and (2) a governor can persuade federal authorities that National Guard members designated for training are needed for state purposes when the overwhelming majority of the National Guard remains at home." Brief for Petitioners 41.

Under the interpretation of the Montgomery Amendment advanced by the federal parties, it seems that a governor might also properly withhold consent to an active duty order if the order were so intrusive that it deprived the State of the power to train its forces effectively for local service:

"Under the current statutory scheme, the States are assured of the use of their National Guard units for any legitimate state purpose. They are simply forbidden to use their control over the state National Guard to thwart federal use of the NGUS for national security and foreign policy objectives with which they disagree." Brief for Respondents 13.

[25] The Governor contends that the state defense forces are irrelevant to this case because they are not subject to being called forth by the National Government and therefore cannot be militia within the meaning of the Constitution. We are not, however, satisfied that this argument is persuasive. First, the immunity of those forces from impressment into the national service appears—if indeed they have any such immunity—to be the consequence of a purely statutory choice, and it is not obvious why that choice should alter the constitutional status of the forces allowed the States. Second, although we do not believe it necessary to resolve the

In light of the Constitution's more general plan for providing for the common defense, the powers allowed to the States by existing statutes are significant. As has already been mentioned, several constitutional provisions commit matters of foreign policy and military affairs to the exclusive control of the National Government.[26] This Court in *Tarble's Case,* 13 Wall. 397 (1872), had occasion to observe that the constitutional allocation of powers in this realm gave rise to a presumption that federal control over the Armed Forces was exclusive.[27] Were it not for the Militia Clauses, it might be

---

issue, the Governor's construction of the relevant statute is subject to question. It is true that the state defense forces "may not be called, ordered, or drafted into the armed forces." 32 U. S. C. § 109(c). It is nonetheless possible that they are subject to call under 10 U. S. C. §§ 331–333, which distinguish the "militia" from the "armed forces," and which appear to subject all portions of the "militia"—organized or not—to call if needed for the purposes specified in the Militia Clauses. See n. 21, *supra.*

[26] See, *e. g.,* Art. I, § 8, cl. 11 (Congress' power to declare war); Art. I, § 10, cl. 1 (States forbidden to enter into treaties); Art. I, § 10, cl. 3 (States forbidden to keep troops in time of peace, enter into agreements with foreign powers, or engage in war absent imminent invasion); Art. II, § 3 (President shall receive ambassadors).

[27] In the course of holding that a Wisconsin court had no jurisdiction to issue a writ of habeas corpus to inquire into the validity of a soldier's enlistment in the United States Army, we observed:

"Now, among the powers assigned to the National government, is the power 'to raise and support armies,' and the power 'to provide for the government and regulation of the land and naval forces.' The execution of these powers falls within the line of its duties; and its control over the subject is plenary and exclusive. It can determine, without question from any State authority, how the armies shall be raised, whether by voluntary enlistment or forced draft, the age at which the soldier shall be received, and the period for which he shall be taken, the compensation he shall be allowed, and the service to which he shall be assigned. And it can provide the rules for the government and regulation of the forces after they are raised, define what shall constitute military offences, and prescribe their punishment. No interference with the execution of this power of the National government in the formation, organization, and government of its armies by any State officials could be permitted without greatly impairing

possible to argue on like grounds that the constitutional allocation of powers precluded the formation of organized state militia.[28] The Militia Clauses, however, subordinate any such structural inferences to an express permission while also subjecting state militia to express federal limitations.[29]

We thus conclude that the Montgomery Amendment is not inconsistent with the Militia Clauses. In so doing, we of course do not pass upon the relative virtues of the various political choices that have frequently altered the relationship between the Federal Government and the States in the field of military affairs. This case does not raise any question concerning the wisdom of the gubernatorial veto established

---

the efficiency, if it did not utterly destroy, this branch of the public service." 13 Wall., at 408.

[28] See *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 318 (1936) ("The powers to declare and wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties, if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality"); The Federalist No. 23, p. 143 (E. Earle ed. 1938) ("[I]t must be admitted . . . that there can be no limitation of that authority which is to provide for the defense and protection of the community, in any matter essential to its efficacy—that is, in any matter essential to the *formation, direction,* or *support* of the NATIONAL FORCES"); L. Henkin, Foreign Affairs and the Constitution 234–244 (1972) (discussing implied constitutional restrictions upon state policies related to foreign affairs); Comment, The Legality of Nuclear Free Zones, 55 U. Chi. L. Rev. 965, 991–997 (1988) (discussing implied constitutional restrictions upon state policies related to foreign affairs or the military).

[29] The powers allowed by statute to the States make it unnecessary for us to examine that portion of the *Selective Draft Law Cases*, 245 U. S. 366 (1918), in which we stated:

"[The Constitution left] under the sway of the States undelegated the control of the militia to the extent that such control was not taken away by the exercise by Congress of its power to raise armies. This did not diminish the military power or curb the full potentiality of the right to exert it but left an area of authority requiring to be provided for (the militia area) unless and until by the exertion of the military power of Congress that area had been circumscribed or totally disappeared." *Id.*, at 383.

in 1952 or of its partial repeal in 1986.  We merely hold that because the former was not constitutionally compelled, the Montgomery Amendment is constitutionally valid.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*