SORRENTINO, APPELLEE, *v.* OHIO NATIONAL GUARD, APPELLANT.

[Cite as Sorrentino *v.* Ohio Natl. Guard (1990), 53 Ohio St. 3d 214.]

(No. 89-860—Submitted April 17, 1990—Decided August 29, 1990.)

\* \* \*"

*Gene Mesh* and *J. Scott Mullins*, for appellee.

*Anthony J. Celebrezze, Jr.*, attorney general, *William J. McDonald* and *William J. Mattes*, for appellant.

HOLMES, J. Appellee raises several arguments why dismissal of the complaint was improper. For purposes of this appeal, most of appellee's arguments concern the alleged contractual nature of his enlistment with the ONG.

Appellee argues that the Statement of Understanding which he signed is part of the enlistment contract he entered into with the ONG. Appellee finds support for this allegation in the Statement of Understanding, which states that in exchange for appellee's satisfactory performance of enlistment responsibilities, he will receive a full tuition grant. Appellee contends that fulfillment of these requirements was a condition of entitlement to full tuition benefits.[5]

Appellee relies on paragraph "d" of the Statement of Understanding, which provides that "* * * [I]f ac-cepted for a Public Institution my instructional and general fee charges will be paid. * * *"

Appellee also asserts that because a recruiter for the ONG confirmed that upon enlistment he would receive a full tuition grant, this promise became a primary enlistment incentive. He alleges that this recruiter did not inform him that the full tuition grant was subject to reduction or elimination during the enlistment term. Appellee further argues that the Statement of Understanding contains no language stating that tuition benefits can be reduced or eliminated by subsequent acts of the General Assembly and are only legally binding upon the ONG for a two-year period.

Appellee also argues that the ONG cannot rely on paragraph "a" of the Statement of Understanding, which provides that the number of tuition grants is limited to an annual average student load of three thousand full-time students per term and "if appropriations for all the ONG Grants applied for are inadequate, I'll receive prompt notification of the next term that appropriations will be adequate for ONG Grants."

Essentially, appellee asserts that the ONG, by its own conduct, ignored the three thousand student limit and used the promise of full tuition grants as a recruiting ploy. Thus, the ONG is precluded from using overloading of the tuition program, which appellee

---

[5] Some of these obligations are set forth below:

"e. I further understand that if I accrue any unexcused absences while eligible for this program, my Unit Commander is authorized to remove me from this program, until I prove to the Commander that I can meet his/her standards.

"f. I further understand that the term satisfactory participation in the Ohio National Guard, to be my full conformance to the personal appearance, weight, discipline and any other standards established by military regulations.

"* * *

"h. I fully understand and agree that my enlistment obligations will take presidence [*sic*] over my undergraduate work at all times, even to the point that it may require me to temporarily interrupt my academic program in order to attend my unit's yearly active duty requirement."

alleges was caused by ONG's own acts, as an excuse for reducing benefits from one hundred percent to sixty percent.

Lastly, appellee contends that Am. Sub. S.B. No. 386, effective March 29, 1988, and Am. Sub. H.B. No. 111, effective July 1, 1989, are unconstitutional because they are retroactive laws and impair the obligation of contracts. See Section 28, Article II of the Ohio Constitution.

The ONG raises two arguments why the Court of Claims properly dismissed the complaint. First, it asserts that neither R.C. 5919.34 nor the Statement of Understanding sets forth an unconditional promise by the ONG to pay a full tuition grant to appellee and other similarly situated class members. To the contrary, R.C. 5919.34 and the Statement of Understanding both state that tuition benefits may be delayed if appropriations are inadequate.

At the time relevant herein, R.C. 5919.34 provided:

"* * * Any resident of Ohio who is a high school graduate without prior military service and who on or after July 1, 1983, enlists in the Ohio National Guard for at least six years and successfully completes initial active duty shall, pursuant to an application therefor, be eligible for educational grants to attend an eligible institution of higher education if he enrolls in the institution not later than twelve months after completing initial active duty, *or such later time as the adjutant general specifies pursuant to division (B) of this section if appropriations are inadequate, as a full-time undergraduate student.*" (Emphasis added.) (140 Ohio Laws, Part II, 3248-3249.)

Paragraph "a" reiterates the conditional nature of the tuition grant program: "* * * if appropriations for all the ONG Grants applied for are inade-

quate, I'll receive prompt notification of the next term that appropriations will be adequate for ONG Grants."

Secondly, the ONG argues that even if R.C. 5919.34 or the Statement of Understanding could be construed as making a binding contractual promise to pay full tuition grants, such a promise would be contrary to both Section 22, Article II of the Ohio Constitution and R.C. 131.33.

R.C. 131.33 states in part: "No state agency shall incur an obligation which exceeds the agency's current appropriation authority."

Section 22, Article II states: "No money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law; and no appropriation shall be made for a longer period than two years."

This court has long held "[t]hat no officers of the state can enter into any contract, except in cases specified in the constitution, whereby the general assembly will, two years after, be bound to make appropriations either for a particular object or a fixed amount — the power and the discretion, intact, to make appropriations in general devolving on each biennial general assembly, and for the period of two years." *State v. Medbery* (1857), 7 Ohio St. 522, paragraph two of the syllabus. Thus, in *Medbery*, a statute which authorized contracts by the state beyond two years was held inconsistent with the state's system of finance and expenditure. In discussing a five-year contract entered into by a board of the state, in which it was to pay $27,500 per year to a contractor, we stated:

"While each general assembly is required to provide revenue and make appropriations for the period of two years, leaving no debt or liability behind, the general assembly existing when these contracts were made, and

who, it must be maintained, had the constitutional power by law to authorize them, have undertaken, by contracts on behalf of the state, to bind the state by present obligation to pay specific amounts of money to certain citizens for services and materials, to be furnished as well during the above-mentioned two years, as also during the period of three years thereafter. It is the three years thereafter — the liability created against the state the moment these contracts were signed, for the specific sums promised for the repairs of those three years — the volunteering on the part of that general assembly to provide for the repair of the canals during those three years, without the power of making appropriations to meet the liability thus authorized and entered into — it is these peculiar characteristics of the contracts which render them inconsistent with the system of finance and expenditure provided by the constitution. * * *" *Id.* at 530-531.

In *State, ex rel. Dickman,* v. *Defenbacher* (1948), 85 Ohio App. 398, 401, 40 O.O. 256, 258, 88 N.E. 2d 65, 66-67, it was held: "Under Article II, Section 22, of the [Ohio] Constitution, the General Assembly may not make an appropriation effective for more than two years," and "[n]o General Assembly can create obligations which extend beyond its own life." See, also, *State, ex rel. Preston,* v. *Ferguson* (1960), 170 Ohio St. 450, 11 O.O. 2d 204, 166 N.E. 2d 365, and 1965 Ohio Atty. Gen. Ops. No. 65-80, at 2-164. Cf. *State, ex rel. Ross,* v. *Donahey* (1916), 93 Ohio St. 414, 113 N.E. 263.

R.C. 5919.34 cannot bind the General Assembly to make appropriations which would go beyond two years and hence would be in contravention of Section 22, Article II. Furthermore, the General Assembly in 1988 reduced the amount of appropriations for the tuition grant program and at Section 36 of Am. Sub. S.B. No. 386 mandated that participants in the program who enlisted prior to December 1, 1987, be given the choice of either a forty percent reduction of tuition benefits or delaying participation in the program until the number of students falls below three thousand. Accordingly, the ONG was without power to pay one hundred percent tuition grants because it could not incur an obligation which exceeded the agency's current appropriation authority. See R.C. 131.33.

Therefore, in this case, regardless as to whether Sorrentino's and other class members' rights to one hundred percent tuition payments were based upon a statute or an enlistment document, a remand on this issue could permit the Court of Claims to order an appropriation of funds by judicial mandate which would usurp the power vested in the General Assembly under the Constitution. Thus, we reverse the court of appeals on this issue.

However, as to Sorrentino's request for rescission of his National Guard enlistment agreement, we conclude that a cause of action has been stated whereby relief could be granted. Specifically, Ohio courts have jurisdiction to decide cases regarding the discharge of members of the ONG not in federal service under the modern militia system found in Section 8, Article I of the United States Constitution:

"The Congress shall have power * * *[:]

"[Clause 15] To provide for calling forth the Militia to execute the Laws of the Union, suppress insurrections and repel Invasions;

"[Clause 16] To provide for organizing, arming, and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States, *reserving to the States, respectively, the Appointment of Officers, and the Authority of*

*training the Militia according to the discipline prescribed by Congress*[.]" (Emphasis added.)

The federal government has left the administration of National Guard personnel to the states. Each state's chief executive, under Section 331, Title 32 of the U.S. Code, may dismiss or dishonorably discharge a guardsman from service with the National Guard.[6] Essentially, "in time of peace the State courts have jurisdiction of a proceeding to secure the discharge of a member of the National Guard of the State." *Bianco* v. *Austin* (1922), 204 App. Div. 34, 36-37, 197 N.Y. Supp. 328, 331. The reason for this is that the National Guard is only a potential part of the United States Armed Forces and does not in fact become a part thereof until the requisite declaration of the existence of an emergency. See Section 672, Title 10, U.S. Code.[7] Therefore, a state court is not without jurisdiction to grant rescission of a National Guard enlistment agreement.[8]

In the case *sub judice* if the Court of Claims finds that the ONG either breached its contract, fraudulently induced Sorrentino, or deprived Sorrentino and other class members of their property without due process then an appropriate remedy could be rescission of the enlistment agreements as requested in the complaint.

Accordingly, we remand this case to the Court of Claims for a determination of the action on the merits with rescission being the sole remedy available to the appellees.

*Judgment reversed in part and affirmed in part.*

SWEENEY, DOUGLAS, WRIGHT, H. BROWN and RESNICK, JJ., concur.

MOYER, C.J., concurs in part and dissents in part.

---

[6] Section 331, Title 32, U.S. Code provides in pertinent part:

"In the National Guard not in Federal Service, no sentence of dismissal or dishonorable discharge may be executed until it is approved by the Governor of the State or territory or Puerto Rico, whichever is concerned * * *."

[7] The state of Ohio retains control over the National Guard until such time as an emergency is declared under Section 672(a), Title 10 of the U.S. Code, which provides:

"In time of war or of national emergency declared by Congress, or when otherwise authorized by law, an authority designated by the Secretary concerned may, without the consent of the person affected, order any unit, and any member not assigned to a unit organized to serve as a unit, of a reserve component under the jurisdiction of that Secretary to active duty (other than for training) for the duration of the war or emergency and for six months thereafter. However a member on an inactive status list or in a retired status may not be ordered to active duty under this subsection unless the Secretary concerned, with the approval of the Secretary of Defense in the case of the Secretary of a military department, determines that there are not enough qualified Reserves in an active status or in the inactive National Guard in the required category who are readily available."

[8] Although a state may release or otherwise discharge a guardsman from its National Guard force, the individual may still be a member of the Army Reserve under Section 3260, Title 10, U.S. Code. As stated in Section 3260:

"Unless discharged from his enlistment as a Reserve, an enlisted member of the Army National Guard of the United States who ceases to be a member of the Army National Guard becomes a member of the Army Reserve. An enlisted member who so becomes a member of the Army Reserve ceases to be a member of the Army National Guard of the United States." See, generally, *Perpich* v. *Dept. of Defense* (1990), 496 U.S. ___, 110 L. Ed. 2d 312, 110 S. Ct. 2418.

MOYER, C.J., concurring in part and dissenting in part. The law is well-settled in Ohio that the General Assembly is prohibited from making appropriations beyond a two-year period. Section 22, Article II of the Ohio Constitution provides: "No money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law; and no appropriation shall be made for a longer period than two years."

As Judge Swan explained in *State v. Medbery* (1857), 7 Ohio St. 522, 532: "And, inasmuch as, by another provision of the constitution, no appropriation can be made for a period beyond two years (article 2, section 22), it follows that, if no debt whatever could be created, and no appropriation made beyond two years, then a present obligation and liability to pay at a period beyond two years, could not be made, because it could not be placed on the footing of liabilities which are provided for by appropriations, and would therefore be inhibited." Thus, it is not permissible for one session of the General Assembly to create debt that is binding upon the next session, and the majority properly ruled that the Ohio National Guard was powerless to continue to provide one hundred percent tuition grants.

However, the Statement of Understanding, which is part of the enlistment agreement, attempts to bind the state beyond the appropriation authority of the General Assembly. It provides that tuition grants will be available for twelve quarters or eight semesters or 2,640 clock hours. This statement cannot obligate the state to pay tuition grants for up to four years. In addition to binding future sessions of the General Assembly, the Statement of Understanding creates an illegal debt of the state, since it creates a present obligation to pay money at a future period which the *Medbery* holding expressly prohibits. *Id.* at 538.

Additionally, the Statement itself informs an enlistee "* * * if appropriations for all the ONG Grants applied for are inadequate, I'll receive prompt notification of the next term that appropriations will be adequate for ONG Grants." This language puts an enlistee on notice that tuition payments are conditioned upon adequate appropriations. The tuition program was created by the General Assembly and may be altered as it was here. It is not for us to judicially "correct" perceived inequitable consequences where the legislative branch acts within its constitutional authority.

The state cannot enter into any agreement which is contrary to the provisions of Section 22, Article II and the *Medbery* holdings. No contract is created when the state promises to provide one hundred percent tuition grants that extend beyond two years. Therefore, remand to the Court of Claims for a determination regarding rescission of a "contract" is not only unnecessary, but it is also a disservice to the parties if we are to be concerned with judicial economy and the cost to litigants of pursuing remedies that the Court of Claims cannot grant.