UNITED STATES

v.

**Technical Sergeant Richard BROWN, Jr., FR251–98–7369, United States Air Force.**

**ACM 29105.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 14 Nov. 1990.

Decided 16 Oct. 1992.

Appellate Counsel for the Appellant: Colonel Jeffrey R. Owens and Major Bernard E. Doyle, Jr.

Appellate Counsel for the United States: Colonel William R. Dugan, Jr., Lieutenant Colonel Brenda J. Hollis, Major Paul H. Blackwell, Jr., and Captain Thomas E. Wand.

Before O'HAIR, SNYDER, and GRUNICK, Appellate Military Judges.

## OPINION OF THE COURT

SNYDER, Judge:

Our original opinion in this case was unpublished (ACM 29105, 6 October 1992). That opinion is hereby withdrawn.

Contrary to his pleas, appellant stands convicted by general court-martial of the wrongful use of marijuana, in violation of Article 112a. He was found not guilty of a specification alleging wrongful use of co-caine. His sentence extends to a bad-conduct discharge, confinement for 5 months, forfeitures, and reduction to E–1. The convening authority approved the sentence as adjudged. The appellant asserts one assignment of error, which we resolve adversely to him and affirm.

The charge and specifications thereunder arose as a result of a random urinalysis inspection, from which appellant's urine sample was reported as positive for marijuana and cocaine metabolites, thereby indicating his use of those two illicit substances. At trial, defense counsel made a timely Motion to Suppress the results of the urinalysis on the basis the inspection did not comply with Military Rules of Evidence 313(b). Specifically, it was not "incident to command," because it was, in fact, directed by staff personnel rather than the appropriate commander. In further support of the motion, the defense also averred a failure of the base to follow the regulation promulgated to control the base's urinalysis program.

The military judge conducted a thorough evidentiary hearing and made exhaustive essential findings of fact, which are amply supported by the evidence of record. Accordingly, except where indicated, we accept and apply the trial judge's findings, as supplemented by our own, as the facts of the case.

As mentioned, Myrtle Beach AFB's (MBAFB) urinalysis program ostensibly was governed by MBAFB Regulation 160–2, dated 28 July 1987. The salient provision of that regulation (and the basic linchpin for the motion) vested responsibility in the commanders and section commanders, of all assigned and attached units, for the initiation, management, and operation of urinalysis inspection tests. App. I. The base regulation also provided for the coordination with certain named "trusted agents," *i.e.*, the staff judge advocate, prior to executing a random urinalysis inspection. However, for reasons not disclosed or developed at trial, the then Commander, 354th Tactical Fighter Wing (who also was the senior installation commander), by letter dated 27 December 1988, directed week-

ly "base-wide screening of all military personnel." App. II. He also directed the base social actions office to execute his directive via computer generated randomly selected lists of personnel identified to submit samples. *See* Air Force Regulation 30–2, Social Actions Program, dated 18 April 1986, paragraph 5–13a.

The 27 December 1988 letter was never promulgated as a change to the existing base regulation nor was the base regulation rescinded. The incumbent commander on the date appellant submitted his sample, 12 June 1990, was the vice wing commander when the 27 December 1988 letter was issued, and he was well aware of and supported the program as established by his predecessor in command. Upon his assumption of command in February 1990, he took no action to change any facet of the then existing program. In fact, via a letter dated 19 March 1990, he indorsed the base's drug abuse program and emphasized vigilant execution thereof. App. III.

## I

Trial defense counsel asserted the failures to rescind the base regulation and promulgate the 27 December 1988 letter as its replacement regulation constituted violations of Air Force Regulation (AFR) 5–8, Preparing Air Force Publications, dated 24 April 1984, paragraphs 4–9 and 1–21, respectively. The trial judge found AFR 5–8 was promulgated to effect orderly dissemination of policy, did not confer rights upon the accused or others similarly situated, and the failure to follow the regulation did not abrogate any statutory or constitutional protections of the accused. He also applied the same findings to the 28 December 1988 letter. The trial judge's ruling was entirely correct.

The preamble of AFR 5–8 states its purpose as providing policies. It is completely devoid of language directive in nature. *United States v. Benway*, 19 U.S.C.M.A. 345, 41 C.M.R. 345 (1970); *United States v. Baker*, 18 U.S.C.M.A. 504, 40 C.M.R. 216 (1969). Further, the specific paragraphs relied upon by defense reflect goals or pre-

ferred methods of handling policy guidance. Neither paragraph provides a failure to comply will void the policy letter or message in question. In fact, paragraph 1–21 states a policy letter or message remains in effect until rescinded, superseded, or replaced by a publication. To encourage project officers to meet the regulation's goal of promulgating policy letters or messages into regulations within 90 days, paragraph 1–21 *suggests* policy letters reflect an expiration date. In the instant case, neither the 27 December 1988 nor March 1990 letter reflects an expiration date.

## II

Subsequent to the 28 December 1988 letter, the primary involvement of unit commanders was notifying members of their respective units of their selection to participate in random urinalyses. By the time appellant was identified as a participant, the random inspections were being performed a maximum of twice per month, rather than the weekly basis specified by the 27 December 1988 directive. The chief of the local social actions office and his noncommissioned officer in charge (NCOIC) were the focal point of the program, deciding which week or weeks the lists for inspection would be computer generated, and then notifying the affected unit commanders of their unit personnel identified by the computer listing. The social actions personnel treated the lists on an extremely close-hold basis, not even informing the wing commander of those identified, or coordinating the lists with the "trusted agents," as prescribed in the base regulation.

Appellant was assigned to the communications squadron, which, at the time, was an asset of Air Force Communications Command (AFCC). As such, his unit was a tenant on Myrtle Beach AFB with responsibility for providing communications support to the base. Except for appellant's unit commander, Major D, the unit's chain of command ran through him to AFCC headquarters.* Major D reported directly

---

* As of October 1990, most local communications units became part of the command and local

to the 354th Tactical Fighter Wing commander. Major D testified it was AFCC policy for its personnel to participate in local drug abuse programs of the base where they were located or attached, including urinalysis inspections. Although he did not believe he possessed authority to withhold or opt-out his personnel from the local program, he personally believed in the program and did not harbor any objections to his personnel participating. His sole role was notifying his personnel to report when identified. He also designated his first sergeant to perform this function. Major D was absent the day the unit received notice of appellant's selection. Consequently, the first sergeant asked appellant's Officer in Charge to notify him and direct him to report to provide a sample.

■ Trial defense counsel vigorously argued that Myrtle Beach AFB's drug abuse program was a case of "staff run amok," and there simply was insufficient involvement of any commanders to maintain its legitimacy. The assertion is without merit. There is a vast difference between a staff official usurping command authority as opposed to scheduling or implementing and administering the execution of a command issued by the commander. The evidence in the instant case supports a conclusion that the situation at Myrtle Beach AFB was the latter.

■ The wing commander, the person ultimately responsible for the health, morale, and general welfare of all assigned and attached personnel; and, the person responsible for the proper execution of the base's mission directed base-wide random urinalysis inspections. His successor in command continued the program intact. During the hearing on the suppression motion, much time was spent on whether the incumbent commander had specifically ratified the 27 December 1988 letter. Defense counsel made much of the fact it was not listed in a directory of existing policy letters. Although frequently done at the new commander's first commander's call, we are unaware of any precedent or regulatory authority which mandates a commander

base they supported, which removed their status

to specifically ratify or adopt the standing orders or policies of the predecessor. In fact, the reverse is the generally accepted practice: all existing orders and policies continue, unless specifically rescinded or changed. We believe any doubt regarding the incumbent commander's position is allayed by his March 1990 letter. Any reasonable reading of the letter reflects full support of the base's existing drug abuse program, of which the urinalysis inspections were an integral part.

■ The fact appellant was assigned to a tenant unit is immaterial. Air Force Regulation 11–4, Host–Tenant Support Responsibilities of U.S. Air Force Organizations, dated 22 December 1989, paragraphs 18a and b, state the host furnishes all social actions services; and, the tenant complies with host directives if social actions services are provided.

Having directed the random urinalysis inspections, the wing commander acted well within his authority in delegating the execution of his directive to his social actions office. Commanders function through their staff and subordinate commanders and are encouraged to delegate administrative duties and authority. *See* AFR 35–54, Appointment To and Assumption of Command, dated 29 April 1988, paragraphs 10 and 11. This action was also consistent with the provisions of AFR 30–2, paragraph 1–3e, which charges the senior installation commander with the responsibility for local social actions programs, and paragraph 5–13a, which designates the Chief, Social Actions, as the office of primary responsibility for base drug testing programs.

### III

We must now consider the manner in which the inspection was conducted. Specifically, did the base's deviations from its regulation on the area vitiate the results of the inspection?

The first area for scrutiny is how the inspections were performed. First, there is

of tenant units.

no issue regarding the efficacy of collecting, identifying, and protecting the chain of custody of the appellant's sample. *Cf. United States v. Strozier,* 31 M.J. 283 (C.M.A.1990). Neither is there an issue regarding the randomness of the inspections. The chief and NCOIC of social actions determined the weeks the inspections would occur primarily by reviewing the calendar of potentially conflicting obligations and selecting a week not in conflict. *See United States v. Johnston,* 24 M.J. 271 (C.M.A.1987). They then placed numbers in a hat (0 to 9; the day of the week for the inspection was also selected in this manner by drawing a number between 1 and 5 representing Monday through Friday) and drew four randomly, returning each number as it was drawn. These numbers were then taken to the computer program section of the Personnel Office, where a program had been devised to use the numbers to randomly generate social security numbers (SSAN). The computer program used could not be manipulated to select a particular SSAN. The number of SSANs requested and generated was predetermined by the quotas allotted for MBAFB by Headquarters, Tactical Air Command. It averaged 93 per month. As mentioned, the wing commander directed the inspections be performed weekly. Over time, however, the frequency became bi-weekly. The record is silent on the reason for the lesser frequency. We must conclude, however, the incumbent commander was aware of the lesser frequency and took no action to change it. Assuming the contrary, *arguendo,* however, does not alter our result.

 Precedents in this area reflect a recurring theme that the exercise of some discretion by implementing subordinates does not, *per se,* invalidate an otherwise valid inspection, provided the subordinates are operating within the overall directive or guidance of the superior, and their actions are not designed or intended to act as a subterfuge for focusing on a particular individual. *United States v. Jones,* 24 M.J. 294 (C.M.A.1987). As the trial judge properly concluded, neither the wing commander's ordering a base-wide inspection program nor social actions' executing the inspections twice per month instead of weekly were done to focus specifically on appellant or otherwise use the base urinalysis inspection program as a subterfuge for improper purposes. Their execution thereof was within the commander's dictate of using a random computer generated listing and their method of selecting dates was devoid of suspicion of criminal activity. *United States v. Johnston,* 24 M.J. at 275.

The other provisions of the base regulation not strictly adhered to were not designed to confer rights upon any individual, and the failure to follow them did not impact the reliability of the testing procedures. As such, the nonadherence did not vitiate the inspection. *United States v. Pollard,* 27 M.J. 376 (C.M.A.1989); *accord, United States v. Strozier,* 31 M.J. at 288.

Our disposal of this issue should not be deemed an endorsement of bases promulgating regulations, then either implementing substantial deviations therefrom, or allowing them to lapse into nonuse without either promulgating a change or rescinding them, as appropriate. Constant administrative vigilance is a must. Further, staff judge advocates should ensure base or unit inspection programs clearly reflect the direction and oversight of the appropriate commander.

## IV

Having reviewed the evidence of record, and all inferences properly drawable therefrom, we are convinced beyond a reasonable doubt of appellant's guilt. We further find appellant's sentence is not inappropriately severe. Accordingly, the findings and sentence are

AFFIRMED.

Senior Judge O'HAIR and Judge GRUNICK concur.