UNITED STATES

v.

**Technical Sergeant Rodney A. EVANS, FR219–60–2389, United States Air Force.**

**ACM 29747.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 19 Sept. 1991.

Decided 25 June 1993.

Appellate Counsel for the Appellant: Colonel Jeffrey R. Owens, Major Alice M. Kottmyer, Major Mary C. Yastishock, and Captain Ursula P. Moul.

Appellate Counsel for the United States: Colonel Richard L. Purdon, Lieutenant Colonel Jeffrey T. Infelise, and Captain Jane M.E. Peterson.

Before O'HAIR, SNYDER, and GRUNICK, Appellate Military Judges.

## OPINION OF THE COURT

SNYDER, Judge:

Appellant was convicted by general court-martial of wrongfully using cocaine, in violation of Article 112a, UCMJ 10 U.S.C. § 912a. He was sentenced to a bad-conduct discharge, forfeiture of all pay and allowances, and reduction to E–1. The convening authority approved the sentence as adjudged. Appellant asserts four assignments of error. Although none of them have merit, some comment is appropriate.

Three of the four assignments of error relate to the trial judge's denial of a motion to suppress the results of a urinalysis inspection, which resulted in appellant's trial. We first address his assertion that the motion should have been granted because the commanders who ordered the inspection were without authority to do so.

### I

■ A motion to suppress is an interlocutory matter addressed to the discretion of the trial judge, and we apply an abuse of discretion standard in reviewing his ruling. *Rhea v. Starr*, 26 M.J. 683 (A.F.C.M.R. 1988). Further, the trial judge made extensive findings of fact. Where those findings are supported by the record, we fully accept them, unless clearly erroneous. *United States v. Burris*, 21 M.J. 140 (C.M.A. 1985). In the instant case, we find the trial judge's factual findings and conclusions fully supported by the evidence of record.

■ Appellant is a reservist. His reserve squadron was one of five reserve squadrons called to active duty and assigned to the 46th Aerial Port Squadron (46th APS) at Dover AFB, Delaware, to support Operations Desert Shield/Desert Storm. This influx of personnel doubled the manning of the 46th APS to approximately 1000. Although the five units had effectively blended into the 46th APS in the *de facto* sense, their reserve parent unit retained "administrative control" of these units. The 46th APS took operational control,[1] however, and there was no doubt as

---

1. Testimony at trial revealed that it was envi-    sioned the five squadrons' parent wing would

to whom they answered and who was the functional commander. Appellant avers that because this "administrative control" was retained by the parent reserve entity, the active duty commander had no authority to order appellant to participate in the inspection in question. Appellant misconstrues the essence of command authority.

Colonel F, the 46th APS commander, testified that, when the reserve squadrons reported, they "understood that it was impossible for them to retain their command and effectively they took their squadron flags down and for all practical purposes handed those flags to me." Although the reserve commanders remained commanders in all respects on paper,[2] these squadrons did not retain integral unit integrity. The members of the five reserve units were interspersed throughout the 46th APS, and the respective reserve unit commanders were made officers in charge of various 46th APS sections, with the senior one becoming Colonel F's operations officer. The 46th APS was functioning under these circumstances when Colonel F directed the urinalysis inspection in question.

■ To enjoy the cloak of propriety, an inspection must be conducted as an incident of command. Mil.R.Evid. 313(b). It necessarily follows that an inspection must be directed or ordered by an appropriate commander. *See United States v. Brown*, 35 M.J. 877 (A.F.C.M.R.1992). The trial judge correctly ruled that, the reserve entity's retention of "administrative control" notwithstanding, Colonel F exercised functional command over all of the reservists attached to the 46th APS, as well as its regular personnel. Colonel F was the person who functioned and was recognized as the commander of *everyone* in the 46th APS. As such, he possessed the requisite authority to direct a urinalysis inspection. *See United States v. Jette*, 25 M.J. 16 (C.M.A.1987); *United States v. Kalscheuer*, 11 M.J. 373 (C.M.A.1981).

■ Appellant also argues, however, that, even if the inspection was directed by the appropriate commander at its inception, it was improperly expanded to include him by a commander without authority to do so. Again, we disagree. Some additional facts are necessary to fully appreciate appellant's assertion.

Colonel F directed an urinalysis inspection of the entire 46th APS. The supporting staff agency, however, advised him there were insufficient laboratory testing quotas available to inspect 1000 personnel, and they could accommodate only about 200 or so. As a result of his concern for the ability of the 46th APS to perform its mission safely, Colonel F designated daily operation of, or working around, heavy equipment and working in close proximity to aircraft as the main criteria for determining what part of the unit would be inspected to the extent of the available test quotas. Ramp and Fleet Services fit those criteria, as well as containing a sufficient number of personnel to exhaust the test quotas. He named those sections and delegated the execution of the inspection to his squadron section commander, Captain SP, and his first sergeant, giving them authority to do whatever was necessary to execute it properly.

---

activate for just such a contingency as Desert Storm. However, as real world paper trail requirements asserted themselves, it became apparent to pertinent authorities that the wing could not activate as a parent, commanding headquarters, and had to remain in its nonactive state. This was deemed necessary to maintain the viability and purpose of the separate reserve computer data bases, *i.e.*, pay records and personnel actions, etc. Had the relevant computer data bases been merged into the regular forces data base, it would have been extremely difficult and time consuming to extract the reserve squadrons' data and return them to the reserve data base. Therefore, separateness

of the units was retained on paper to assure an orderly deactivation and return to the parent reserve unit.

2. Administrative type corrective actions, *e.g.*, reprimands and counsellings, were handled by the reserve commanders, and their first sergeants were given office space to carry out their administrative functions. Although there never were any test cases, Colonel F believed he possessed Article 15, UCMJ, authority over the reservists, although probably he would have deferred to the appropriate reserve commander to take the action.

During the inspection of Ramp and Fleet, Staff Sergeant T presented himself for inspection and duly provided a urine sample. Those administering the inspection honestly believed Sergeant T to be assigned to Ramp, as he once was. After he provided his sample and departed, it was learned he actually was assigned to Pallet Control, a new section formed solely for the massive increase in activity due to Desert Storm. Pallet Control was formed by pulling personnel from other sections of the squadron to perform a specific function. Because they had inspected a member of a section outside Ramp and Fleet, Captain SP and the first sergeant believed the integrity of the inspection was in jeopardy if they did not also include the remainder of Pallet Control in the inspection. It was obvious from their testimony that they were concerned with not treating any personnel differently from those who were inspected. *See* Mil.R.Evid. 313(b).

Captain SP testified that first, Colonel F actually desired the entire squadron inspected; second, Pallet Control fit the criteria of operating heavy equipment and working in close proximity to aircraft; third, she had to decide immediately or lose the ability to inspect personnel who were finishing the night shift; and fourth, she believed she had Colonel F's authority to include Pallet Control to protect the integrity of the inspection. The supporting staff agency agreed to support testing the additional personnel to preserve the overall integrity of the inspection. Needless to say, appellant was assigned to Pallet Control.

An inspection may examine the whole or any part of a unit or organization. Mil. R.Evid. 313(b). We agree with the trial judge's ruling that this was not an impermissible expansion of the inspection beyond the scope of Colonel F's authorization. First, neither Captain SP nor anyone else suspected appellant or other persons of illicit drug use. She acted in good faith to comply with what she believed were the rules for a legitimate inspection. Second, Colonel F did not actually exclude any part of the squadron, but, instead, prioritized sections to best utilize the available testing quotas. Further, we agree with the trial

judge's findings and conclusion that Captain SP, as squadron section commander of the 46th APS, inherently possessed the requisite authority to order the inspection of the Pallet Control section. Colonel F testified he had not withheld any authority from Captain SP. In any event, the inspection was not improperly expanded beyond, or restricted below, permissible limits, and Captain SP applied the criteria designated by Colonel F. *United States v. Johnston,* 24 M.J. 271 (C.M.A.1987).

Appellant next asserts the inspection was ordered solely as a subterfuge for a search to obtain evidence for use in a criminal proceeding. To support this assertion, appellant argues, as he did at trial, that two prior command directed urinalyses (CDU) of two other airmen tainted this inspection. These CDUs were directed from 1 to 2 months prior to the inspection in question.

■ Appellant correctly notes an inspection may not be used as a subterfuge to search for evidence of crime. Mil.R.Evid. 313(b); *Johnston,* 24 M.J. at 274–75. However, the fact that an inspection includes an airman or airmen who may have been involved in an earlier drug incident does not automatically convert an otherwise valid inspection into a subterfuge for a search. *United States v. Shepherd,* 24 M.J. 596 (A.F.C.M.R.1987), *pet. denied,* 25 M.J. 238 (C.M.A.1987).

■ We find the evidence of record compellingly supports the trial judge's findings of fact and legal conclusions, and we accept them in full. The trial judge ruled: (1) the two CDUs, both of which tested positive, were not a significant factor in Colonel F's decision to order an inspection; (2) Colonel F was considering a sweep primarily due to safety concerns; and (3) he did not suspect any particular person, nor was he looking for evidence against a particular person. *See United States v. Burris,* 25 M.J. 846 (A.F.C.M.R.1988). There simply is no evidence to support appellant's spurious claim that the inspection was ordered to obtain incriminating evidence against the two airmen involved in the earlier CDUs. We find no abuse of discretion by the trial judge in

admitting the results of the urinalysis inspection. Mil.R.Evid. 313(b); *United States v. Alexander,* 32 M.J. 664 (A.F.C.M.R.1991), *aff'd,* 34 M.J. 121 (C.M.A.1992); *United States v. Pappas,* 30 M.J. 513 (A.F.C.M.R.1990).

## II

█ Appellant's final assignment of error is,

WHETHER THE MILITARY JUDGE ERRED ... BY DENYING THE DEFENSE CHALLENGES FOR CAUSE TO FOUR COURT MEMBERS WHO WERE RATED BY A COMMANDER WHOSE POLICY IS TO AGGRESSIVELY ENFORCE HIS PERSONAL POLICY OF NOT TOLERATING DRUG ABUSE BY ANYONE AND INSIST THAT OTHERS DO THE SAME.

The only evidence offered on this assertion at trial was a policy letter by the wing commander, the senior installation commander at Dover AFB,[3] stating the installation's substance abuse policy. *See* App. The four members challenged by defense counsel stated they were familiar with drug abuse policy as Air Force policy more so than via their familiarity with the letter in question. In any event, they all stated they would decide the case based on its own merit and evidence, and not on some general policy.

Generally, policy letters of this type must be written to address general command concerns for the morale, discipline, and general welfare of the command. They must not be written with a view towards dictating or affecting the outcome of any particular court-martial. *United States v. Carter,* 25 C.M.R. 370 (C.M.A. 1958) and cases cited therein. Further, even absent an intent to affect the outcome of a judicial proceeding, policy letters must not have that ultimate impact, or give the appearance of having the impact of a commander dictating the results of a trial. *United States v. Harrison,* 41 C.M.R. 179 (C.M.A.1970).

In the instant case, there is no evidence or indication that the policy letter in question was written with appellant's or any other person's trial in mind. Neither is there any evidence the letter affected, or gave the appearance of affecting, appellant's or any other person's trial. The record supports the trial judge's ruling that the contents of the letter primarily are aimed towards prevention, and are within the acceptable parameters of the wing commander's command responsibility. We find no evidence of command influence or the appearance thereof. *United States v. Harrison,* 41 C.M.R. 179; *United States v. Carter,* 25 C.M.R. 370.

The findings and sentence are correct in law and fact, Article 66c, UCMJ, are hereby,

AFFIRMED.

Judge GRUNICK concurs, Senior Judge O'HAIR did not participate.

## APPENDIX

### DEPARTMENT OF THE AIR FORCE

#### 17 JUN 1991

Substance Abuse Policy

Distribution D

1. Drug and alcohol abuse are serious problems that can adversely affect this Wing. By aggressively enforcing Air Force standards and insisting that others do the same, we can continue to minimize the impact of substance abuse on our mission.

2. I will not tolerate drug abuse by anyone under my command, either on or off duty. Air Force policy is clear and unequivocal: drug abuse is not compatible with Air Force standards. We must do everything in our power to prevent, detect, and correct it. Urinalysis testing is one effective deterrent to drug abuse since everyone is subject to no notice testing. Once detected, swift, firm, and consistent punitive actions are vital.

---

**3.** The Commander, Twenty–First Air Force (21st AF), located at McGuire AFB, New Jersey, convened appellant's court-martial.

3. It is Air Force policy to prevent alcohol abuse and alcoholism among our personnel and their family members, as well as restore to full duty status those with problems attributable to alcohol abuse. For those with persistent problems we ensure humane management and administrative disposition. Since early detection greatly improves the chances of successful rehabilitation, we owe it to our people and to the Air Force to ensure they receive our prompt attention.

4. Another issue which greatly concerns me is drunk and drugged driving. This is the most common violent crime in our nation today. The annual toll in death and injury is staggering and unnecessary. Every one of us has a personal responsibility to stress the responsible use of alcohol and take strong corrective actions for those who fail to heed this message. We all must be intolerant of people who drive while impaired by alcohol or other drugs.

5. Substance abuse is a serious issue which continues to be of concern to all of us. Working together we can achieve our common goal: a wing free of the adverse effects of substance abuse.

(s) Michael A. Moffitt

MICHAEL A. MOFFITT, Colonel, USAF

Commander