**UNITED STATES**

v.

**Senior Airman Jesse D. DiMUCCIO,
United States Air Force.**

Misc. Dkt. 2004–04.

U.S. Air Force Court of Criminal Appeals.

26 May 2005.

Appellate Counsel for the United States: Lieutenant Colonel Gary F. Spencer, Lieu-tenant Colonel Robert V. Combs, Major Carrie E. Wolf, and Captain Jin–Hwa L. Frazier.

Appellate Counsel for Appellee: Colonel Carlos L. McDade, Major Sandra K. Whittington, and Captain John N. Page III.

Before STONE, GENT, and SMITH, Appellate Military Judges.

OPINION OF THE COURT

SMITH, Judge:

The military judge in this case suppressed a positive drug urinalysis test result and a confession by the accused. He concluded the accused was not properly included in a unit urinalysis inspection ordered by the commander of an Arizona Air National Guard (ANG) wing, because, at the time of the inspection, the accused was on active duty and not part of the ANG unit. The government appealed the military judge's ruling to this Court under Article 62, UCMJ, 10 U.S.C. § 862. We find the military judge's factual determinations to be supported by the record and his conclusions of law to be correct.

*Background*

The accused, Senior Airman (SrA) Jesse DiMuccio, was charged with wrongfully using cocaine. The evidence against him consisted of a urine specimen he submitted on 7 August 2004 that tested positive for a cocaine metabolite, as well as a confession he made to the Air Force Office of Special Investigations (AFOSI) after the urinalysis test result was known. SrA DiMuccio submitted the specimen as part of a unit inspection ordered by the Commander, 162d Fighter Wing (162 FW), Arizona ANG.

In April 2003, SrA DiMuccio enlisted in the Arizona ANG and served as a member of the 162 FW, but when he submitted the urine specimen he was performing an active duty tour under the authority of 10 U.S.C. § 12301(d) (federal duty performed with the consent of the member and state authorities). The issue at trial, and now before this Court, is whether the inspection was valid as it applied to the accused. To resolve that issue, we must examine the status of both the commander who ordered the inspection and

the accused who submitted to it. The pivotal question is whether SrA DiMuccio was part of the 162 FW on 7 August 2004. If not, the positive urinalysis result is not admissible as evidence from an inspection. Mil. R. Evid. 313(b).

*Jurisdiction and Standard of Review*

The United States may appeal an order or ruling of the military judge "which excludes evidence that is substantial proof of a fact material in the proceeding" in cases in which a punitive discharge may be adjudged. Article 62(a)(1)(B), UCMJ, 10 U.S.C. § 862(a)(1)(B). The alleged offense in this case carries a maximum punishment that includes a punitive discharge. *Manual for Courts–Martial, United States (MCM)*, Part IV, ¶ 37e(1)(a) (2002 ed.).

Despite our factfinding powers under Article 66(c), UCMJ, 10 U.S.C. § 866(c), in ruling on issues raised under Article 62, we "may act only with respect to matters of law." Article 62(b), UCMJ, 10 U.S.C. § 862(b). On matters of fact, we are bound by the trial judge's factual determinations unless they are unsupported by the record or clearly erroneous. *United States v. Plants*, 57 M.J. 664, 665 (A.F.Ct.Crim.App.2002) (citing *United States v. Burris*, 21 M.J. 140, 144 (C.M.A. 1985)), *pet. denied*, 58 M.J. 181 (C.A.A.F. 2003). The military judge made detailed findings of fact and concluded that SrA DiMuccio was not a part of the 162 FW for purposes of inspection testing under Mil. R. Evid. 313(b).

*Inspections*

Mil. R. Evid. 313(b) defines an "inspection" as "an examination of the whole or part of a unit, organization, installation, vessel, aircraft, or vehicle ... conducted as an incident of command the primary purpose of which is to determine and to ensure the security, military fitness, or good order and discipline of the unit, organization, installation, vessel, aircraft, or vehicle." Inspections are essential to maintain mission readiness, and the authority to inspect is an inherent incident of command. Drafter's Analysis, *MCM*, A22–23. We look to the rule to resolve substantive issues on the authority for and scope of inspections, because Mil. R. Evid. 313(b) is more than a rule of evidence. As the Draft-

er's Analysis explains, the rule amounts to an explicit Presidential authorization for command inspections. Mil. R. Evid. 313(b) provides that "[a]n order to produce bodily fluids, such as urine, is permissible in accordance with this rule." The urinalysis inspection conducted in this case was ordered by the 162 FW Commander incident to his command of the wing and its subordinate units.

*Federal and State Statutes (Titles 10 and 32, United States Code)*

Upon his enlistment in the Arizona ANG, SrA DiMuccio became part of the air arm of the organized militia of Arizona. *See* 32 U.S.C. § 101. Citizens who enlist in a state ANG unit are simultaneously enlisted in the Air National Guard of the United States (ANGUS), part of the Reserve Component of the United States. 10 U.S.C. §§ 10112, 12401, 12403; 32 U.S.C. § 101(7); *Perpich v. Department of Defense*, 496 U.S. 334, 345, 110 S.Ct. 2418, 110 L.Ed.2d 312 (1990). While serving in the state militia, Air National Guardsmen are often said to be serving in "Title 32 status," a shorthand reference to their federally-funded state training status under Title 32 of the United States Code. ANG members ordered to active duty enter federal service as part of the ANGUS and are subject to the laws and regulations governing the United States Air Force. 10 U.S.C. § 12405. When activated, ANG members are said to be serving in "Title 10 status," that is, federal active duty status, distinct from their state militia role.

The distinction between Title 10 active duty status and Title 32 state militia status is significant. In Title 10 status, activated Air National Guardsmen are treated, with very limited exceptions, like all other active duty service members for the duration of their activation. They are subject to the Uniform Code of Military Justice, 10 U.S.C. §§ 801–946, and serve under the President of the United States as Commander in Chief. In Title 32 status, state militiamen perform a very different, though no less important, mission. They are not subject to the Uniform Code of Military Justice found in Title 10, but they are subject to state criminal laws, which may include a state military justice code. State militiamen serve under the Gov-

ernor as Commander in Chief. The status distinctions are worth further emphasis, because they lie at the heart of the issue in this case:

> The Federal mission of the National Guard is to provide properly trained and equipped units for prompt mobilization for war, national emergency or as otherwise needed. The Guard's state mission is to provide trained and disciplined forces for domestic emergencies or as otherwise directed by State law. Those Army and Air National Guard units not mobilized or under Federal control report to the Governors of the fifty States, the Commonwealth of Puerto Rico and the Territories of Guam, and the Virgin Islands; or to the Commanding General of the Distric[t] of Columbia, respectively. Individual State Adjutants General supervise the 54 National Guard organizations. These officers, usually major generals, are State officials. States routinely call National Guard units to active duty each year for emergency relief from natural disasters, for search and rescue operations, for protection of life, for preservation of order, for maintenance of vital public services, and for counterdrug operations.

Department of Defense Directive (DODD) 1215.15–H, *The Reserve Components of the United States Armed Forces*, ¶ C5.1.2.2 (Jun 1996).

### Air Force Organization and Command Authority

There is no evidence that the 162 FW, as an organization, had been ordered to active Federal duty as of 7 August 2004; therefore, we will presume it was a federally recognized unit of the Arizona National Guard operating under Title 32. *See generally* DODD 1235.10, *Activation, Mobilization, and Demobilization of the Ready Reserve* (23 Sep

2004); Air Force Instruction (AFI) 38–101, *Air Force Organization*, Chapter 4 (21 Apr 2004); ARIZ.REV.STAT. § 26–154 ("The organization of the national guard shall be prescribed by the United States department of defense. It shall consist of units allocated to the state and recognized by the federal government and assigned by the secretary of defense or a subdivision of the department of defense.").

The military judge found that the 7 August 2004 inspection was ordered by the Commander, 162 FW, although the written order actually was signed for the commander by the wing's Director of Military Equal Opportunity. The military judge further found, and appellate government counsel concedes, that the Commander, 162 FW, was in Title 32 status when he ordered the inspection. Those findings are supported by the evidence and consistent with the status of the organization being commanded.

SrA DiMuccio enlisted in the Arizona ANG on 5 April 2003 and was assigned to the 162d Security Forces Squadron (162 SFS) in Tucson, Arizona. The 162 SFS was a subordinate unit of the 162 FW.

On 29 December 2003, SrA DiMuccio was ordered to active duty in support of Operation Noble Eagle. The authority for his activation was 10 U.S.C. § 12301(d) and Exec. Order No. 13223.[1] The period of active duty was 1 January 2004 to 30 September 2005. SrA DiMuccio was "assigned"[2] for administrative control (ADCON) to the 201st Mission Support Squadron (201 MSS) at Andrews Air Force Base, Maryland, a unit under the Air National Guard Readiness Center (ANGRC). The ANGRC is an active duty field operating agency of Headquarters Air Force responsible for, among other things, command and control over ANGUS members performing duty in Title 10 status.

---

1. Exec. Order No. 13223, *Ordering the Ready Reserve of the Armed Forces to Active Duty and Delegating Certain Authorities to the Secretary of Defense and the Secretary of Transportation* (14 Sep 2001), provided additional authority to the Department of Defense and the former Department of Transportation to "respond to the continuing and immediate threat of further attacks on the United States."

2. To "assign" is "[t]o place units or personnel in an organization where such placement is relatively permanent, and/or where such organization controls and administers the units or personnel for the primary function, or greater portion of the functions, of the unit or personnel." Joint Publication 1–02, *DOD Dictionary of Military and Associated Terms* (12 Apr 2001).

Once on active duty, the accused was "attached"[3] to Air Education and Training Command for "OPCON [operational control] and specified ADCON." He was directed to perform duty "AT HOME STATION: 162 FW Tucson, Arizona" but, as the military judge found, the accused was actually attached for duty to the 355th Security Forces Squadron (355 SFS), an active duty unit at Davis–Monthan Air Force Base (AFB) in Tucson, Arizona. He and other activated Air National Guard members performed duty with Detachment 1, Alert Aircraft Facility, located on Davis–Monthan AFB.

## Discussion

■ There is no factual dispute as to whether SrA DiMuccio was on active duty in Title 10 status on 7 August 2004. But the government contends he was also sufficiently part of the Title 32, Arizona ANG organization to bring him within the scope of the inspection. We do not agree.

Once activated, SrA DiMuccio's status changed significantly. The Supreme Court's characterization of the overlapping but distinct relationship between the National Guard and the National Guard of the United States is well-known: guardsmen "now must keep three hats in their closets-a civilian hat, a state militia hat, and an army hat-only one of which is worn at any particular time." *Perpich*, 496 U.S. at 348, 110 S.Ct. 2418. Some in the Air Force use a "lights on/lights off" analogy; when the lights are "on" in the ANG, they are "off" in the ANGUS, and vice versa. Whatever the characterization, the

law is clear: apart from a limited exception not applicable here,[4] ANGUS members ordered to active duty are relieved from duty in the National Guard of their state or territory, from the effective date of their order to active duty until they are relieved from that duty. 32 U.S.C. § 325(a)(1). Put another way, "the state affiliation is suspended in favor of an entirely federal affiliation during the period of active duty." *Perpich*, 496 U.S. at 349, 110 S.Ct. 2418.

On 7 August 2004, SrA DiMuccio was a member of the ANGUS and assigned to the 201 MSS and attached to the 355 SFS, both Title 10 active duty organizations. He was not a member of the 162 FW, a Title 32 ANG unit. Therefore, he was not part of the "unit, organization, installation,[5] vessel, aircraft, or vehicle" being examined in the inspection. Mil. R. Evid. 313(b).

The government nonetheless contends that SrA DiMuccio was functionally a member of the 162 FW when he participated in the inspection urinalysis.[6] On 6 September 2003, 162 FW Special Order M–1 established the 2004 Unit Training Assemblies (UTA) schedule for the wing and ordered all members of the wing to attend them unless attending a separate UTA or a rescheduled UTA. The 7 August 2004 inspection urinalysis was conducted on one of the scheduled UTAs. The 162 FW's Drug Testing Program Administrative Manager ran the software program that randomly selected names of members from the unit roster who were to submit urine samples. SrA DiMuccio's name appar-

3. Attachment is "[t]he placement of units or personnel in an organization where such placement is relatively temporary." *Id. See also* AFI 36-2110, *Assignments*, Attachment 1 (9 Jun 2003) ("Attached" is defined as: "Responsibility for a member for temporary administration or duty at other than his or her permanent unit of assignment (and the unit of attachment is other than member's permanent duty station), for temporary command and control during the member's absence similar to that exercised at the member's permanent duty station.").

4. An *officer* is not relieved from state duty if the President authorizes such service in both state and federal statuses, and "the Governor of his State or Territory or Puerto Rico, or the commanding general of the District of Columbia National Guard, as the case may be, consents to

such service in both duty statuses." 32 U.S.C. § 325(a)(2).

5. The defense suppression motion represented that the 162 FW is located near Tucson International Airport, "geographically separated from and not in any way physically attached to Davis–Monthan Air Force Base." There is no evidence to contradict that representation. The military judge found, consistent with the representations made by both parties, that, when activated, the accused was performing duty at Davis–Monthan AFB.

6. Ironically, the only way the accused could have been part of the unit was if he had been in Title 32 status himself, which is to say not subject to the UCMJ and the court-martial convened against him.

ently was not removed or otherwise flagged to indicate he was performing temporary active duty service. The standard memorandum notifying him that he had been selected to provide a sample listed his unit as "162 STF/SPS," as did the "Drug Testing Program Testing Subjects" roster. SrA DiMuccio acknowledged receipt of the notice and order to provide a urine specimen, and he listed his unit as 162 FW. There is no indication that the accused objected to providing a urine specimen or otherwise raised a concern about being included in the inspection.

The government supports its position by reference to the Air Force Instruction governing the drug abuse testing program and two opinions of this Court, *United States v. Moore*, 45 M.J. 652 (A.F.Ct.Crim.App.1997), and *United States v. Evans*, 37 M.J. 867 (A.F.C.M.R.1993). AFI 44–120, *Drug Abuse Testing Program*, ¶ 4.7.6.2 (1 Jul 2000), which applies to the ANG, charges unit commanders to "[e]nsure all unit military members regardless of rank or status, are subject to inspection testing." At trial, the government contended this provision should be read broadly to include ANG members regardless of their Title 10 or Title 32 status. The military judge read that provision in the context of the instruction as a whole and concluded "status" referred only to the member's duty status—present for duty, absent on temporary duty, or on leave. We agree with his interpretation. More fundamentally, on 7 August 2004, SrA DiMuccio was not one of the "unit military members" under the 162 FW Commander's command.

*Moore* and *Evans* actually support our conclusions in this case. The issue in *Moore*

was whether the appellant could be part of a drug urinalysis inspection in a unit to which she was attached, not assigned. We concluded she was properly included, but the appellant in *Moore* was an active duty troop and the focus was on the exercise of concurrent command authority of active duty units by active duty commanders. *Moore*, 45 M.J. at 652. In *Evans*, the appellant was a reservist whose reserve squadron was activated and assigned to an active duty unit. The commander of the active duty unit of assignment ordered a urinalysis inspection that included the appellant and his unit. The appellant contended that, because his reserve unit retained "administrative control," the active duty commander lacked the authority to order him to participate in the inspection. We disagreed, concluding there was no doubt the activated reservist was under the command of the active duty commander. *Evans*, 37 M.J. at 867. The common thread in *Moore* and *Evans* was the unity of status between the commanders and the members involved—all were in Title 10 active duty status.

*Conclusions*

SrA DiMuccio was not a member of the 162 FW on 7 August 2004 and so was not properly part of the unit or organization inspected. The status distinction is not a legal technicality or a matter of form over substance. The statutory framework, grounded in the United States Constitution, reflects the fundamentally different purposes of Federal active duty forces and state militias. However challenging it may be to identify command authority in a particular situation, this status distinction must be recognized and honored.[7] As applied to SrA

---

7. Untangling concurrent command authority can be a challenge. This is not a new issue; ANG, ANGUS, and active duty command relationships have been reviewed periodically by the Air Force Judge Advocate General's Corps. *See e.g.* Opinions of The Judge Advocate General 1993/19; 1997/139; 1998/20; 1998/117; 1999/61; 2000/43; 2000/91; and 2003/25. In the deployed and joint environment, the issues tend to focus on who will exercise command and disciplinary authority when two or more commanders may have concurrent jurisdiction over service members. *See e.g.* Rule for Courts–Martial 201(e). Those challenges generally are resolved by cooperative agreement or policy determina-

tions on who should exercise authority under the particular circumstances, but the status of the commander(s) and member(s) is not in question—all are in active duty status. More vexing are situations like this case where activated members stay in place, perhaps still working in the same duty section they occupied in state status. The experiences the Air Force is having with so-called blended and associate organizations with Title 10 and Title 32 personnel performing a common mission in different statutory statuses are also vexing. But, at least for UCMJ purposes, there must be unity of statutory status between the responsible commanders and their troops. Commanders must have unity of status

DiMuccio, the inspection was not "incident to command" of the 162 FW Commander. Because the accused was not part of the 162 FW, we hold that the inspection, as it was applied to him, was not conducted in accordance with Mil. R. Evid. 313, and the urinalysis test results are inadmissible. Mil. R. Evid. 313(a).

The military judge found no other basis upon which to admit the urinalysis results and neither do we. The evidence is not admissible as the product of a consent search (Mil. R. Evid. 314(e); *United States v. White*, 27 M.J. 264 (C.M.A.1988)); there was no search or seizure of the accused's urine based upon probable cause (Mil. R. Evid. 315 and 316); and the evidence was not taken for a valid medical purpose (Mil. R. Evid. 312(f)).

██ Finally, the military judge suppressed the accused's confession to the AFOSI as being "derived from the positive urinalysis," presumably according to Mil. R. Evid. 311(e)(2). That rule provides that derivative evidence may be admitted:

> if the military judge finds by a preponderance of the evidence that the evidence was not obtained as a result of an unlawful search or seizure, that the evidence ultimately would have been obtained by lawful means even if the unlawful search or seizure had not been made, or that the evidence was obtained by officials who reasonably and with good faith relied on the

issuance of an authorization to search, seize or apprehend or a search warrant or an arrest warrant.

The record has scant information about the confession, but the government did not argue for admissibility of the derived confession and offered no evidence to satisfy their preponderance burden under the rule. Consistent with *United States v. Campbell*, 41 M.J. 177, 184 (C.M.A.1994), the confession is not admissible because the government has not shown that the accused's confession was not obtained as a result of the challenged urinalysis.

*Decision*

Applying the Article 62, UCMJ, standard of review, we conclude the military judge did not err in holding that the urinalysis test result and the derivative confession were inadmissible. His factual determinations are supported by the record and his conclusions of law are correct. Accordingly, the appeal by the United States is

DENIED.

██

---

with their troops to fully enforce their orders. Conversely, before exposing a member who is subject to the UCMJ to disciplinary action for an offense based on a commander's order, it is evident that both the member and the commander must be subject to the UCMJ. Otherwise, a

commander would not be subject to the significant restrictions on command authority under Article 37, UCMJ, 10 U.S.C. § 837 (unlawfully influencing action of court) and Article 98, UCMJ, 10 U.S.C. § 898 (noncompliance with procedural rules).