# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLOR, POND, and STEELE
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist YORUBA J. JONES**
**United States Army, Appellant**

ARMY 20230366

Headquarters, U.S. Army Maneuver Support Center of Excellence
and Fort Leonard Wood
Steven C. Henricks, Military Judge
Colonel Robert E. Samuelsen II, Staff Judge Advocate

For Appellant: Catherine M. Cherkasky, Esquire (on brief and reply brief).

For Appellee: Colonel Richard E. Gorini, JA; Major Lisa Limb, JA; Captain Stewart A. Miller, JA (on brief).

2 April 2026

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

POND, Senior Judge:

An enlisted panel sitting as a general court-martial convicted appellant, contrary to his pleas, of one specification of abusive sexual contact and one specification of sexual assault, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 [UCMJ]. The panel members acquitted appellant of one specification of wrongful use of marijuana, in violation of Article 112a, UCMJ. The military judge sentenced appellant to a dishonorable discharge, confinement for twelve months, and reduction to the grade of E-1.[1]

---

[1] The military judge sentenced appellant to two months of confinement for the offense of abusive sexual contact to be served concurrently with twelve months of confinement for the offense of sexual assault.

Before this court, appellant argues the military judge erred in finding the government complied with Rule for Courts-Martial [R.C.M.] 914.[2] In relevant part, that rule requires the trial counsel, after a prosecution witness testifies, to produce any statement made by that witness that relates to the witness's testimony and is in the possession of the United States. In this case, the witness was the victim, and the statement at issue was her unsworn statement to her administrative separation board convened by her Illinois National Guard unit, during which she disclosed she was a victim of sexual assault. The government provided the defense a written copy of the victim's statement but was unable to recover the audio recording, which was deleted six to eight months after the board convened. Appellant argues the government's failure to produce the audio recording of the victim's statement violated R.C.M. 914 and the military judge abused his discretion in failing to strike the victim's testimony. For the reasons discussed below, we disagree and affirm the findings and sentence.

## BACKGROUND

At the time of the offense and at trial, appellant and the victim were both members of the Illinois Army National Guard. They first met freshman year in college and quickly became best friends. The victim described appellant like a brother and stated that his service in the National Guard inspired her to also enlist.

In 2019, appellant received orders mobilizing him to deploy for 400 days to Guantanamo Bay, Cuba in federal service on active-duty under Title 10 of the U.S. Code.[3]

---

[2] Unless otherwise stated, citations are to the *Manual for Courts-Martial, United States* (2019 ed.), in effect at appellant's court-martial.

[3] Persons who enlist in a state National Guard unit simultaneously enlist in the National Guard of the United States as part of the Reserve Component of the United States. 10 U.S.C. §§ 12401, 12403; 32 U.S.C. § 101(5); *see also Perpich v. Dep't of Def.*, 496 U.S. 334, 345 (1990). They retain their status as members of the separate state Guard unit, unless ordered to federal active-duty status. 32 U.S.C. §§ 102, 325. When so ordered, they are relieved from duty in the National Guard of their state and "shall be returned to their National Guard status upon relief from that duty." 32 U.S.C. § 325(c). As a result of this dual-enlistment structure, a member of the National Guard has three different potential statuses: (1) state militia status under state authority and control; (2) federal active status under Title 10; and (3) Title 32 status, which is federally funded but under state control. When we refer to a member of the National Guard being in a Title 10 status, we refer to a member of the National Guard called into federal service under the control of the President and

(continued . . .)

During his deployment, appellant and the victim talked almost every day. They played online video games, sometimes also with the victim's girlfriend. After the deployment ended, appellant returned home to Chicago. On 25 July 2020, shortly after his return and while appellant was still in a Title 10 status, the victim and her girlfriend took appellant out for tacos and strawberry margaritas in Logan Square on the northwest side of Chicago. Afterwards, they made two stops—first, to buy liquor, and second, to drink and smoke marijuana—before driving to the girlfriend's place. The victim's girlfriend gave appellant the option of sleeping on a couch in the living room or another couch in her bedroom before she and appellant began playing video games on her PlayStation while sitting on the edge of her bed. The victim, meanwhile, told them that she was tired, climbed into the bed, and went to sleep.

The girlfriend testified that while the victim slept, she and appellant continued to play Call of Duty and Grand Theft Auto on PlayStation. She also tried to teach appellant how to roll a blunt of marijuana. Eventually, she told appellant she was tired and climbed into bed next to the victim and fell asleep. Not long after, the girlfriend awoke to movement and found appellant lying on the bed next to her. Appellant tried to place her hand on his penis through the hole in his boxer shorts and kissed her on the lips. The girlfriend testified she moved away and turned around to face the victim, who was sleeping on her back. Then, both she and appellant began fondling the victim's breasts.

The victim testified she thought she was dreaming when she felt something warm on her chest and her stomach before feeling a sharp pain in her vagina. She awoke to find appellant's fingers penetrating her vulva.[4] The victim shouted, smacked appellant's hand away, and ran into the bathroom. The girlfriend then

---

(. . . continued)
may be, except those applicable only to members of the Regular Army or Regular Air Force, as the case may be." 10 U.S.C. § 12405; *see also* 10 U.S.C. § 12301(d), 12302(a); 10 U.S.C. § 802(a)(3) (extending UCMJ jurisdiction to members of the Army National Guard of the United States "but only when in Federal service.") When we refer to Title 32 status, we are referring to status in the National Guard that is federally funded but under the control of state governors and subject to state military law. *See* 10 U.S.C. § 101(c)(2); 32 U.S.C. § 328.

[4] In addition to the victim's testimony, the girlfriend testified that the victim was asleep when appellant touched the victim's breasts and put his hand into the victim's pants, stating, "it's so wet," before the victim woke up and screamed. Additionally, appellant admitted to law enforcement in an interview on 22 April 2022 that he penetrated the victim's vagina with his fingers while she was asleep, that the victim awoke during the penetration, and that he believed the victim did not want him to put his fingers inside her vagina.

drove the victim home while appellant sat in the backseat. During the drive, appellant sent the victim numerous texts asking what was wrong. The next morning, appellant apologized, texting, "I was drunk I'm sorry. I didn't mean to touch you like that." The victim did not immediately report the incident to law enforcement or her chain of command.

Almost a year later, on 5 June 2021, an administrative separation board convened to determine whether the victim should be discharged from the Illinois National Guard for misconduct, specifically for testing positive multiple times during unit urinalyses both before and after appellant's charged offenses. The board was appointed by The Adjutant General and convened under "[National Guard Regulation] 600-200, Enlisted Personnel Management, 31 July 2009."[5] As part of the victim's unsworn statement to the board, the victim disclosed that she had been sexually assaulted. The victim did not identify appellant as the assailant but stated the following:

> After completing rehab, I felt I was doing well and was in a good place in my life and with regards to the National Guard. Then something happened that changed everything. In July of 2020, I was sexually assaulted. The person who sexually assaulted me was a person I considered to be a good friend, and we attended college together. He joined the National Guard after his freshman year. I looked up to this person, and he was an influencing factor in my decision to join the National Guard after my sophomore year of college. The incident happened when he was home on a break after deployment. I feel this incident changed me in many ways, some of which are: (1) loss of appetite and drastic weight loss; (2) trouble, sleeping; (3) I was fearful of being around men; (4) I associated him with other people in the Guard; (5) I am fearful of being around men in the Guard because of him; (6) I lost trust in people; (7) I was diagnosed with PTSD and depression. I feel like I am a different person now than I was before the assault. I feel all the stress from the assault caused me to relapse.

The board's reporter, a paralegal noncommissioned officer (NCO), began typing the victim's unsworn statement but when she saw the victim reading from a piece of paper, she stopped. She obtained the victim's written statement and marked it and attached it as an exhibit to the record of the board's proceedings. The paralegal NCO also recorded audio of the proceedings, to include the victim's

---

[5] National Guard Regulation 600-20, Enlisted Personnel Management, 25 March 2021, superseded this regulation and was in place at the time of the board.

unsworn statement. The audio, however, was not required by regulation or policy. Rather, the paralegal NCO used the audio recordings to assist less experienced paralegals to ensure the accuracy of the summarized transcripts, which were required by regulation. Because there was no requirement to make or maintain the audio recordings, the unit did not burn or transfer the recordings to a disc and generally deleted the audio recordings when the recording device ran out of space. In the case of the victim's board proceedings, the audio was deleted sometime between January and March 2022, roughly six to eight months after the board convened.

Following the board, the victim made a report of sexual assault to the North Chicago Police Department.[6] On 25 February 2022, the victim's unit notified the Criminal Investigation Division (CID) at Fort McCoy, Wisconsin of the offenses. Criminal Investigation Division interviewed appellant in April 2022 at the Great Lakes Naval Station, Illinois. On 19 July 2022, appellant was ordered to report for active duty on 1 August 2022. The government preferred charges on 15 August 2022 and soon thereafter learned of the lost audio recording of the victim's statement from her administrative separation board.

Before trial, the government filed a motion *in limine* requesting a preliminary ruling that R.C.M. 914 did not apply to the lost audio recording.[7] The government argued Army Regulation 135-178[8]—the regulation governing administrative separation boards for National Guard personnel who are not performing full-time active duty service in the U.S. Army—did not require an audio recording of the board. Rather, it required only a summary of the proceedings and a verbatim record of the findings and recommendations. In contrast, Army Regulation 635-200[9]—

---

[6] The paralegal NCO testified that by policy, the Illinois National Guard was required to refer any allegations of sexual assault to local civilian law enforcement, to whom the victim separately reported the sexual assault the Monday following the board.

[7] The government requested a preliminary ruling on the R.C.M. 914 issue before trial under Military Rule of Evidence 104(c) and R.C.M. 906 (b)(13). "A request for a preliminary ruling on admissibility is a request that certain matters which are ordinarily decided during trial of the general issue be resolved before they arise, outside the presence of members. The purpose of such a motion is to avoid the prejudice which may result from bringing inadmissible matters to the attention of the court members." R.C.M. 906(b)(13) discussion.

[8] Army Reg. 135-178, Enlisted Administrative Separations, para. 3-18*d*. (7 Nov. 2017).

[9] Army Reg. 635-200, Active Duty Enlisted Administrative Separations (19 Dec. 2016).

governing administrative separations of service members serving on active duty under Title 10—required an audio recording of the board's proceedings. In support of its motion, the government called the paralegal NCO who served as the board's reporter who testified in addition to her observations of the victim's unsworn statement, that everyone involved in the board proceedings were in a Title 32 status. The government also called the victim who testified that the written statement attached to the board proceedings was the same statement that she read aloud to the board, verbatim.

In granting the government's motion, the military judge determined that: (1) the recorded statement was never in the possession of the United States because the victim and her administrative separation board were in a Title 32 status; (2) if R.C.M. 914 applied, the government satisfied its obligations by producing the written statement, which was substantially identical to the audio recording; and (3) neither the prosecutorial arm of the United States nor the Illinois Army National Guard were negligent in their actions.

Appellant now argues this court should set aside the findings and sentence because the military judge failed to issue an appropriate remedy under R.C.M. 914 where the government had possession of the audio recording of the victim's statement and then negligently failed to preserve it.

## LAW AND DISCUSSION

### A. Standard of Review and Applicable Law

This court reviews a military judge's ruling on a R.C.M. 914 motion for an abuse of discretion. *United States v. Clark*, 79 M.J. 449, 453 (C.A.A.F. 2020) (citing *United States v. Muwwakkil*, 74 M.J. 187, 191 (C.A.A.F. 2015)). "An abuse of discretion occurs when a military judge's findings of facts are clearly erroneous, or his conclusions of law are incorrect." *Id.* (citing *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015)).

R.C.M. 914(a) states:

> After a witness other than the accused has testified on direct examination, the military judge, on motion of a party who did not call the witness, shall order the party who called the witness to produce, for examination and use by the moving party, any statement of the witness that relates to the subject matter concerning which the witness has testified, and that is:

JONES – ARMY 20230366

> (1) In the case of a witness called by the trial counsel, in the possession of the United States; or
>
> (2) In the case of a witness called by the defense, in the possession of the accused or defense counsel.

R.C.M. 914(f)(2) defines "statement" as including:

> A substantially verbatim recital of an oral statement made by the witness that is recorded contemporaneously with the making of the oral statement and contained in a recording or a transcription thereof . . .

If a party does not comply with R.C.M. 914, the rule mandates that the military judge "shall order" that the testimony of the witness be disregarded by the factfinder or in the case of the government's noncompliance, "shall declare a mistrial if required in the interest of justice." R.C.M. 914(e)(1). In cases where the witness statement was lost, courts have recognized "a judicially created good faith loss doctrine." *Muwwakkil*, 74 M.J. at 193 (citation omitted). "The good faith loss doctrine 'excuses the Government's failure to produce "statements" if the loss or destruction of evidence was in good faith.'" *United States v. Sigrah*, 82 M.J. 463, 471 (C.A.A.F. 2022) (quoting *Muwwakkil*, 74 M.J. at 193).[10] Negligent conduct may serve as a basis to find the good faith loss doctrine does not apply. *Muwwakkil*, 74 M.J. at 193; *but cf. United States v. Marsh*, 21 M.J. 445, 451-52 (C.M.A. 1986) (applying good faith loss doctrine despite government negligence).

Because the language of R.C.M. 914 specifies that it applies to statements "in the possession of the United States," our superior court has held in the case of a prosecution witness, the rule "applies only to statements possessed by the prosecutorial arm of the federal government or when a nonfederal entity has a joint investigation with the United States." *United States v. Thompson*, 81 M.J. 391, 396 (C.A.A.F. 2021). The rule "does not apply if the statement is not in the possession of the United States." *Id.* at 395 (clarifying that the rule is also not concerned with

---

[10] Following appellant's court-martial, the President amended R.C.M. 914 to specifically provide for an exception in the rule when a statement is lost. Executive Order 14,103, 88 Fed. Reg. 50,560-61 (Aug. 2, 2023); *see Sigrah*, 82 M.J. at 468 (Ohlson, C.J. concurring) (Maggs, J., concurring) (underscoring the President's authority to amend R.C.M. 914); *see also Sigrah*, 82 M.J. at 469 (Maggs, J., concurring) (same). The rule now provides: "In the event the other party cannot comply with the rule because the statement is lost, and can prove, by a preponderance of the evidence, that the loss of the witness statement was not attributable to bad faith or gross negligence..." Rule for Courts-Martial, *Manual for Courts-Martial, United States* (2024 ed.) 914(e)(2).

7

"the collection or creation of evidence" but rather with the "preservation and disclosure of statements in the government's possession.").

The language of R.C.M. 914, which the President promulgated in 1984, aligns with the language of the Jencks Act, codified under Title 18, with the exception that R.C.M. 914 also applies to witnesses called by the defense.[11] In light of the similarities, our superior court has concluded that in analyzing R.C.M. 914 issues, this court should look to Jencks Act case law and Supreme Court precedent. *Muwwakkil*, 74 M.J. at 190-91.

If a military judge's ruling under R.C.M. 914 is in error, this court tests for prejudice "based on the nature of the right violated," considering whether the error is constitutional or nonconstitutional in nature. *Clark*, 79 M.J. at 454 (quoting *United States v. Tovarchavez*, 78 M.J. 458, 465 (C.A.A.F. 2019)). For preserved R.C.M. 914 violations of a nonconstitutional nature, this court determines whether the error had a substantial influence on the findings, weighing: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question." *Sigrah*, 82 M.J. at 467 (quoting *United States v. Kohlbek*, 78 M.J. 326, 333 (C.A.A.F. 2019)).

*B. Discussion*

*1. Not in the Possession of the United States.*

Based on the evidence before the military judge, we agree that because the administrative board and the victim were in a Title 32 status at the time the victim gave the statement, the statement was not in the possession of the United States. Nor is there evidence that the audio recording later came into the possession of the federal prosecutorial arm before it was deleted.

The significance between Title 10 active-duty status and Title 32 state militia status was clearly articulated by our sister service court in *United States v. Dimuccio*, 61 M.J. 588 (A.F. Ct. Crim. App. 2005), upon which the military judge's ruling relied. When called into active federal service, activated National Guardsmen "are treated, with very limited exceptions, like all other active duty service members for the duration of their activation. They are subject to the Uniform Code of Military Justice, 10 U.S.C. §§ 801-946, and serve under the President of the United States as Commander in Chief." *Id.* at 589; *see also* 10 U.S.C. § 12401 (providing members

---

[11] The Jencks Act, codified at 18 U.S.C.S. § 3500, requires a district court judge, upon motion by the defendant, to order the government to disclose statements of its witnesses that are related to the subject matter of their testimony after each witness testifies on direct examination.

8

of the Army National Guard "are not in active Federal service except when ordered thereto under law."). Whereas National Guardsmen in a Title 32 status are not subject to the UCMJ, but "are subject to state criminal laws, which may include a state military justice code" and "serve under the Governor as Commander in Chief." *Dimuccio*, 61 M.J. at 589-90 (later citing to Department of Defense Directive (DODD) 1215.15-H, *The Reserve Components of the United States Armed Forces*, P C5.1.2.2 (Jun 1996)); 32 U.S.C. § 328; *see also* National Guard Regulation 600-20, Personnel-General: Enlisted Personnel Management (25 March 2021), para. 6-6 ("The separation of a Soldier from the ARNG is a function of state military authorities in accordance with states laws and regulations."). Thus, we conclude that because members of the National Guard in a Title 32 status are under state control—even though federally funded—and are a state entity vice federal entity for purposes of R.C.M. 914.

Consequently, the audio recording of the victim's statement was not in the possession of the United States and R.C.M. 914's requirements were inapplicable.

*2. The Government Complied with R.C.M. 914.*

Assuming arguendo that the United States was in possession of the audio recording, the government nevertheless complied with R.C.M. 914 by producing a "substantially verbatim recital" of the victim's oral unsworn statement. That is, the government produced the written copy of the statement that the victim read aloud, word for word, and that written copy was later attached as an exhibit to the record of the proceedings. The board's reporter testified that she witnessed the victim read from a piece of paper, which she later included as an exhibit. The victim also testified that same exhibit was the piece of paper that she read to the administrative separation board exactly as it was written.

Unlike other cases involving lost audio recordings, here, the government had in its possession a "substantially verbatim recital" of the victim's statement. *Cf. Sigrah*, 82 M.J. 465-66 (CID's recordings of the interview with the victim and two witnesses were not affirmatively preserved and were automatically overwritten); *Muwwakkil*, 74 M.J. at 189-90 (the government lost the recording of the complaining witness's Article 32, UCMJ testimony); *Clark*, 79 M.J. at 453 (stating "there is no way to determine with certainty as to what was said on missing Disc 4 . . . ."). This was not an attempt to recreate a statement from memory months later but was the actual statement that the victim read to the board. To the extent that there were any slight deviations, we note that the rule does not require a "verbatim recital" but a "*substantially* verbatim recital." (emphasis added).

### 3. *The Good Faith Loss Doctrine Applied.*

Finally, the record supports the military judge's conclusion that there was no negligence committed on the part of the Government—by the prosecutorial arm of the United States nor by the Illinois National Guard—in failing to preserve the audio recording. There was no requirement to make or maintain an audio recording of the board's proceedings, either by regulation or by local policy. As the board's reporter testified, the audio recording was merely a tool for less experienced paralegals to ensure the accuracy of their summarized transcripts. The record also supports the military judge's conclusion that the trial counsel acted with appropriate diligence once they became aware of the victim's statement to her administrative separation board by promptly seeking all of the victim's statements and providing the written copy of the victim's prepared statement to the board. We separately note that CID did not become involved in appellant's investigation until well after, or at best contemporaneous with, the deletion of the audio recording. We find the military judge did not abuse his discretion in ruling the good faith loss doctrine applied.

For all the reasons stated above, we find the military judge did not abuse his discretion in ruling the government had complied with R.C.M. 914. Because we find no abuse of discretion, we need not address whether or to what extent appellant may have been prejudiced.

**CONCLUSION**

The findings of guilty and the sentence are AFFIRMED.[12]

Chief Judge FLOR and Judge STEELE concur.

FOR THE COURT:

//JAMES W. HERRING, JR//
Clerk of Court

---

[12] The Entry of Judgement is amended to reflect "ACCA Case Number" as "20230366."